# Cyndall SHARP *v.* M. J. KEELER

CA 06-714

256 S.W.3d 528

Court of Appeals of Arkansas
Opinion delivered May 9, 2007

*Brenda Austin, Ltd.*, by: *Brenda Horn Austin*, for appellant.

*Matthews, Campbell, Rhoads, McClure, Thompson & Fryauf, P.A.*, by: *George R. Rhoads* and *Sarah L. Waddoups*, for appellee.

DAVID M. GLOVER, Judge. Cyndall Sharp appeals the Washington County Circuit Court's grant of M.J. Keeler's petition for change of custody of the parties' minor son, Corbin Michael Jonas Sharp Keeler, who was born August 30, 2004. On appeal, she argues that the trial court erred in finding (1) that she "acted in ways to the detriment of the child and that parental alienation on the part of appellant was a material change of circumstances warranting modification of its original custody decree and thereby granting custody to appellee, M.J. Keeler," and (2) that she was only entitled to supervised visitation when there were no facts to support a finding that supervised visitation was in Corbin's best interest. Briefly stated, we affirm the trial court's decision regarding the change of custody and reverse and remand with regard to visitation. However, "brevity" is not the watchword in this matter — there was a detailed initial order of custody, a detailed petition seeking a change of custody, detailed testimony at the hearing, and a detailed ruling from the bench, all captured in detail in the opinion of this court.

In *Alphin v. Alphin*, 90 Ark. App. 71, 74-75, 204 S.W.3d 103, 105-06 (2005) (internal citations omitted), our court set forth the standards for reviewing modifications of custody:

> Although the trial court retains continuing power over the matter of child custody after the initial award, the original decree is a final adjudication of the proper person to have care and custody of the child. Before that order can be changed, there must be proof of material facts which were unknown to the court at that time, or proof that the conditions have so materially changed as to warrant modification and that the best interest of the child requires it. The burden of proving such a change is on the party seeking the

modification. The primary consideration is the best interest and welfare of the child, and all other considerations are secondary. Custody awards are not made or changed to punish or reward or gratify the desires of either parent.

In child-custody cases, we review the evidence de novo, but we do not reverse the findings of the trial court unless it is shown that they are clearly erroneous. A finding is clearly erroneous, when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. Because the question of whether the trial court's findings are clearly erroneous turns largely on the credibility of witnesses, we give special deference to the superior position of the trial judge to evaluate the witnesses, their testimony, and the child's best interest. There are no cases in which the superior position, ability, and opportunity of the trial judge to observe the parties carry as great a weight as those involving minor children.

*Background Facts*

The parties in this case were never married. In a very precise order filed of record on April 4, 2005, but ordered to be effective as to February 25, 2005, the trial court initially awarded custody of Corbin to Sharp, subject to visitation by Keeler. The order contained numerous terms and conditions of visitation, including that neither party would make derogatory comments about the other in the presence of the child; that Sharp would not text message Keeler while he was exercising visitation with Corbin; that Sharp would cease leaving "tacky" notes for Keeler; that Sharp was not to do anything to alienate Corbin from Keeler; that Sharp was to have Corbin ready for visitation at the time visitation was to begin; and that when Sharp needed a babysitter, she was to give Keeler first opportunity to babysit and she was to notify Keeler as soon as she was aware she needed a babysitter. The order further enumerated that until Corbin was three years old, visitation would be every Saturday from 9:00 a.m. until 5:00 p.m.; every Wednesday from 5:30 p.m. until 7:30 p.m., unless Keeler's college or employment conflicted, and then the visitation was to be on Thursday at the same time; and any additional visitation upon which the parties agreed was appropriate. Holiday visitation was set forth, as well as visitation for Corbin's birthday, on which Keeler was entitled to visitation from 11:00 a.m. until 2:00 p.m. The order also provided that the parties were to keep each other

fully informed of his or her address, telephone number, and all known pertinent information regarding Corbin's health, education, and welfare. In addition, the order stated that Corbin's birth certificate was to be changed to reflect that his name was Corbin Michael Jonas Sharp Keeler.

Five months later, in September 2005, Keeler filed a thirty-five page document entitled "Petition for Contempt Citation and Petition for Change of Custody," in which Keeler alleged that Sharp had continued to use the name Sharp instead of Sharp-Keeler for Corbin; that she would not acknowledge "Corbin Keeler," stating that that was not their son's name; and that Corbin's medical records indicated Sharp instead of Keeler. Keeler further alleged that Sharp had made derogatory remarks about him in front of Corbin; that Sharp had continued to text message and call him during his visitation; that Sharp had made him miss his Father's Day visitation; that Sharp had continued to leave him tacky notes; that Sharp had actively done things to alienate Keeler from Corbin; that Sharp had failed to have Corbin ready for visitation; that Sharp had denied Keeler visitation; and that Sharp had failed to keep Keeler updated on Corbin's medical conditions.

*Hearing Testimony*

Keeler testified at length during a two-day hearing. He stated that he was happy when the trial judge initially set rules for visitation because he thought it would be less stressful and that he would be able to babysit Corbin when Sharp could not be with him. However, Keeler testified that Sharp presented difficulties for him getting to see Corbin, that Sharp continued to use "Sharp" as Corbin's last name instead of Keeler, and that she told him that she does not know who Corbin Keeler is. For example, in response to an instant message Keeler testified he sent Sharp to tell Corbin Keeler that he loved him, Sharp replied that Keeler could only speak to his imaginary son because Keeler was not Corbin's name. Keeler stated that Corbin's account with AR Kids First was under the name Corbin Sharp. Keeler also said that Sharp's mother continued to call him names like "sissy" and "asshole" in front of Corbin.

Keeler testified that Sharp tried to give him a book on babysitting, which offended him because he was Corbin's father, not just his babysitter. Keeler recounted that on a check Sharp wrote him for stop-payment fees, she wrote "sexual favors" on the

memo line. Keeler also said that Sharp had on one occasion left him a note taped to Corbin's diaper, which he thought was "disturbing."

Keeler stated that he felt alienated from Corbin. As examples, he said that Sharp would not let him have visitation because Corbin was too sick, but then when he checked with the doctors, they told him that Corbin was not too sick; that Sharp still did not use the last name Keeler for Corbin; that Sharp acted like Keeler was not capable of taking care of Corbin; that Sharp would not let him go to Corbin's doctor visits; that if Corbin was napping when he came to pick him up for visitation, he was required to wait until Corbin woke up, but that rule did not apply if Sharp came to get Corbin at Keeler's and he was napping; and that Sharp would accuse him of causing Corbin to be constipated.

Keeler said that on one occasion when he was picking Corbin up for visitation, Sharp told him that Corbin had an ear infection and needed to see the doctor. Keeler did not take him to the doctor because Corbin was not running a fever and seemed to be okay; however, Keeler testified that he called a doctor and found out the correct dosage of Tylenol for a child under two and gave a smaller dose to Corbin just to be safe. When Keeler returned Corbin to Sharp, he told her that he had given him Tylenol. Thereafter, he testified that Sharp began text messaging him, asking how much Tylenol he had given Corbin. She finally text-messaged him that she and Corbin were at the emergency room and that the doctors needed to know if they needed to pump Corbin's stomach. According to Keeler, he went to the emergency room but did not find Corbin or Sharp there; it turned out that Sharp had never taken Corbin to the emergency room and she was at home all the time.

Keeler testified that Sharp failed to keep him informed about Corbin's medical issues. He said that he found out about Corbin's surgery to put tubes in his ears by reading Sharp's "away" message to friends on Yahoo Messenger that said, "EVERYONE, thanks for all the prayers! Please continue to pray for Corbin during his surgery, leave a message." It was Keeler's testimony that his wife discovered that Corbin was having surgery at the Ear, Nose and Throat Clinic and, when he arrived to see what type of surgery Corbin was having, the doctor told him that Sharp had said that she did not want him back there and that the doctor did not want him to make a scene. Keeler said that he remained outside until the

surgery was completed and then he went back. He said that Sharp ignored him at first but then let him hold Corbin while she got her car.

Keeler said that on another occasion, Sharp began calling his sister, mother, and wife and began asking about family-disease history. Sharp sent Keeler an instant message that she needed to talk to him about Corbin's arm, that it was urgent; Keeler did not answer the message because he was not at a computer. Keeler said that when he finally reached her, Sharp would not tell him why she needed his family disease history but "never mind" because she had found it anyway. Keeler said that on September 22, 2005, he got a message from Sharp that he would not be able to have his visitation because she and Corbin were at the hospital, but that she did not tell him in which hospital they were. He finally found they were in Arkansas Children's Hospital. When he spoke with Sharp next, she told him that Corbin had histiocytosis, a rare blood disease, and that he had had to have a tumor removed from his arm. Keeler said that he thought that Sharp did not want him to come to Little Rock for the surgery and that was why she did not tell him about it. He further stated that at first, Children's Hospital would not tell him anything, then they said that he needed a code word from Sharp before they could tell him anything. He said that he had to beg Sharp for the code word before she gave it to him, and then that Sharp would not let the nurse give him any more information than what Sharp had told him.

Keeler stated that Corbin had to have chemotherapy treatments in Little Rock, but even though he offered, Sharp would not let him take Corbin to Little Rock by himself. Keeler, his wife, Sharp, and Corbin all made the trip together, and Keeler said that they got along fine. He stated that everyone was getting along when Corbin began receiving his treatments in Northwest Arkansas, but then at one treatment, Sharp got upset that Keeler's wife was also present at the treatment. Keeler said that the treatments were initially scheduled in Bentonville so that he could go to them, but that Sharp switched them to Fayetteville so that he could not go anymore. When he arrived at a treatment in Fayetteville, Sharp told him in front of everyone in the waiting room that he could not go back with her when Corbin got his treatment because it was stressful to Corbin; Keeler said that he then left because his feelings were hurt and he was embarrassed. He later asked Sharp if she would let him go back if he came to the next chemotherapy appointment; she said no, so he did not bother going back. Keeler

said that he would like to be able to go to the appointments, but he did not feel like he was welcome, and that was why he did not go anymore. Keeler stated that he had tried to get Corbin's medical records, but that Sharp had still not signed a medical authorization.

Keeler said that he was denied visitation after the tubes were put in Corbin's ears. He said he was also denied visitation for a longer period of time after the surgery at Children's Hospital because Sharp said that Corbin was too clingy and could not be away from her. He testified that Sharp insisted on supervised visitations, which Keeler agreed to a couple of times. Keeler said that he believed that there were times when Corbin was left with other people after his surgery at Children's Hospital even though he was denied his visitation.

Keeler recounted a time where Sharp would not allow Keeler's mother to pick up Corbin, even though she was authorized to pick him up. Sharp emailed Keeler and said that she did not think it would be best for his mother to pick Corbin up because in the past Corbin had been stressed after visiting Keeler's mom. Sharp also told Keeler that she did not think that his mother was capable of taking care of a child undergoing chemotherapy.

Keeler said that on February 18, 2006, he and his wife went to pick Corbin up for visitation. Sharp heard Keeler's wife cough while standing outside in the cold, and Sharp denied visitation because she thought Keeler's wife was sick. He also said that on numerous occasions, Sharp has not had Corbin ready for visitation when he arrived and that he has had to wait for Sharp to get him ready. Keeler said that he does not get to make up any visitation time he misses when he has to wait on Sharp to get Corbin ready.

Keeler stated that Sharp refused to allow his wife to pick Corbin up, even though she was authorized to do so. According to Keeler, he told Sharp that his wife was authorized to pick Corbin up — Sharp told him that she did not care what the order said.

Keeler complained that Sharp would not give him the first right to babysit. He said that Sharp told him that her mother was not considered a babysitter because she was family. Keeler said that he thought Sharp was saying to him that her family got the first option to babysit Corbin instead of him. Keeler said that he asked several times to babysit while Sharp was at work, and that she told him that she needed at least forty-eight hours' notice if he wanted Corbin. He said she told him that a babysitter was a paid person, not family. While Keeler admitted that Sharp occasionally allowed

him to have extra visitation, he said that he did not know if she ever allowed him to babysit while she was working.

Keeler testified that he received a call from DHS because he had been accused of mistreating Corbin; however, that accusation was determined to be unfounded.

Keeler stated that he also had problems getting his mid-week visitation. He said that his understanding was that if he could not have visitation on Wednesday, that he got Thursdays; he said that Sharp now said that visitation should only be on Thursdays, even if there was a conflict.

Keeler said that he had not freely been given Corbin's medical information, and that Sharp sent him a message threatening to withhold all information about Corbin's life if Keeler continued to "loathe Corbin's Mommy." Keeler said that he had to work on Corbin's birthday during his scheduled visitation time, and that Sharp told him that she was not obligated to change her schedule to accommodate him. Keeler said that he did not believe that he had been treated well by Sharp over the last year with regard to Corbin, and that he had learned how a non-custodial parent should be treated. He said that he knew it was important for Corbin to be with Sharp and how important visitation was; he said that if he received custody, he would not treat her the way she treated him.

Jennifer Keeler, Keeler's wife, testified about the times she had tried to pick up Corbin, and Sharp would not allow her to do so. Jennifer said that after she tried twice to pick up Corbin, without being allowed to do so, she did not try to pick him up for visitation any more. Jennifer said that she and Sharp were getting along until she came to one of Corbin's chemotherapy appointments, at which time Sharp became very upset. Jennifer said that she was never really sure with which Sharp she was going to talk.

Sharp also testified at length. She testified that there were different times that she did not follow the court order because she did not believe that it was what the trial court had ordered and she did not think it was a valid order. She said that other times she did not follow the order, she was concerned about Corbin's safety. She stated that there was a period of time after Corbin's biopsy that she did not allow unsupervised visitation because Corbin had had a difficult time at the hospital. Sharp said that Keeler had not made her feel safe about Corbin being with him, and that she had tried to give him information about Corbin's health problems and food

allergies, but that Keeler always treated her like she was overreacting. Sharp said that she was nervous at first because she was a new mom, and then Keeler had refused to tell her what and how much medication he had given Corbin. Sharp also said that Keeler took Corbin into public when Corbin was sick and that he did not feed him properly. In addition, Sharp complained that Keeler had failed to properly clean Corbin after he had bowel movements.

Sharp stated that she had a lot of trouble getting Keeler to administer Corbin's medication, and that was her basis for not allowing unsupervised visitation. She admitted that she had told Keeler that she had taken Corbin to the emergency room — she said that she thought that if Keeler believed it was an emergency, he would tell her how much Tylenol he had given Corbin.

Sharp said that she had tried to tell Keeler about Corbin's ear surgery but that Keeler kept hanging up on her. She also said that she tried to tell him about the surgery at Children's Hospital, but that he hung up again, and she quit trying.

Sharp testified that she felt physically threatened by Jennifer Keeler because she followed her after Sharp would not let her take Corbin. Sharp said that she was driving Corbin to Keeler's house so that he could have his visitation, and that Jennifer followed her extremely closely and that it did not seem to her that Jennifer was thinking of Corbin's safety at all.

Sharp said that she changed the chemotherapy treatments to Fayetteville because Corbin's nurse transferred to Fayetteville. She said that it was an issue of convenience, and that it was not to deliberately keep Keeler from attending the treatments.

Sharp stated that it was her understanding of the order that if she had special dates or appointments that she was supposed to call Keeler to watch Corbin. She said that it seemed disruptive to require Corbin to get up from a nap so that Keeler could watch him. She also said that she did not feel like Corbin was being babysat when he had special play dates with her mother or Sharp's brother. She further explained that she did not contact Keeler if she went into work after Corbin was asleep because her sisters were at home.

Sharp testified that when she wrote "sexual favors" on the check memo line, she was just joking. She denied knowing why Corbin's medication was labeled Sharp instead of Sharp-Keeler. In response to her message to Keeler about "loathing Corbin's

Mommy," she said that she was just saying that Keeler's hatred of her would get in the way of his relationship with Corbin. Sharp also claimed that Keeler had free access to any of Corbin's medical records. She testified that the times she denied unsupervised visitation, she did so out of concern for Corbin's safety, health, and mental health.

With respect to Corbin's stay at Children's Hospital, Sharp denied that she instructed the nurse not to release any information to Keeler. She said that as soon as she knew Corbin's diagnosis, she called Keeler and told him. She said that she did not tell any of Keeler's family about the diagnosis because she thought it would be best to calmly explain things to Keeler.

### Trial Court's Findings

At the close of the hearing, the trial court changed custody to Keeler. In a lengthy ruling from the bench, the court first took issue with Sharp's testimony that she did not believe that the initial court order was a valid court order, stating that it was a valid order until the trial court vacated it. The trial court also noted that Sharp "want[ed] your cake, and you want to eat it, too," stating that while Sharp did not want to follow the order, she certainly wanted Keeler to be bound by it. The trial court read the initial order out loud in open court, and then reminded everyone that the court had specifically admonished Sharp to promote the bond and relationship between Corbin and Keeler, but that the court had heard that day that things were worse than they were previously. As an example, the trial court cited the many instances where Sharp continued to send Keeler "tacky little e-mails." The trial court addressed the fact that Sharp sent Keeler notes about Corbin's food taped to Corbin's diaper, and notes in which Sharp had stated that with a little "guidance," Keeler could be a better father. The court questioned how Keeler could get any information from Corbin's doctors when Sharp refused to sign a medical release and continued to instruct nurses not to give Keeler any medical information. The court noted that all of that behavior was to the detriment of the child.

The trial court addressed the "Tylenol incident," noting that Keeler and his wife called a medical professional to find out the correct dose of Tylenol to give Corbin, and then only gave him one-half of that amount to be on the safe side, that Corbin was doing fine and not running a fever, but that Sharp threw a "hissy fit" because Keeler did not take Corbin to the doctor. The court

then contrasted that incident with the one where Corbin was running a fever while in Sharp's custody but Sharp did not take him to the doctor because she could maintain his fever at home and he was not getting worse.

Addressing the visitation after the biopsy incident, the trial court stated that it understood Sharp's concern for Corbin after the biopsy, but it found that there was no testimony to show that Keeler was unfit and could not take care of Corbin during that time. The court further noted that Keeler's visitation was only for the day, that it was not like Keeler was going to have him for an extended period of time.

The trial court addressed the issue of Sharp failing to let Keeler babysit Corbin and allowing her mother, brother, or sisters to do so instead. The court reaffirmed that its order did not say to let Keeler babysit only when Sharp thought it was okay or when Corbin would not miss a nap or only when Corbin was awake, but that Keeler was to have the first right to take care of his child when Sharp could not do so. The court found it "ludicrous" that Sharp did not consider her family to be babysitters but considered Keeler to be a babysitter and that she provided him with a babysitter's guide, which undercut the father-son relationship and evidenced Sharp's attempts to undermine Keeler's relationship with Corbin even after being ordered by the court not to do so. The trial court held Sharp in contempt for failing to allow Keeler to babysit and sentenced Sharp to two days in jail but suspended it on the condition that Sharp follow court orders.

The trial court also addressed the issue of Sharp failing to have Corbin ready for visitation and the fact that Keeler was required to wait for Corbin to wake up if he was asleep when Keeler arrived to pick him up for visitation, but that Sharp did not wait if she was picking Corbin up from Keeler and Corbin was asleep. The court stated that it was as if Keeler played by Sharp's rules or did not get to play at all.

The trial court also addressed the issue of Keeler learning that his son was having surgery from a text message sent out by Sharp on her messenger, but that Sharp did not inform Keeler that Corbin was having surgery. The court told Sharp that her e-mail did not take care of letting Keeler know about the surgery ahead of time; that an e-mail that just says to pray for Corbin was "evil"; and that it was no wonder that Keeler was irritated when he finally tracked down where the surgery was taking place and was then

told by the doctor not to make a scene because he did not know what was going on with his son. The court found that Sharp was clearly not advising Keeler of medical procedures and information; that she did not let him get medical information; and that she then told him that he could not be a good father because he did not know the medical information. The court also found that Sharp e-mailed Keeler that she was at the emergency room with Corbin, when in fact she was not, so that Sharp could "teach [Keeler] a lesson," and that Sharp continued to refuse to keep Keeler updated on medical information with regard to Corbin's biopsy on his arm, leaving only a "little message" that there was something wrong but not giving Keeler the whole picture, i.e., that Corbin had an appointment in Little Rock the next day. In the trial court's words, it found that Sharp was playing "evil games" against Keeler; that her actions were detrimental to her child; that she was terrorizing and harassing Keeler to the detriment of Corbin; and that Sharp, in the whole spirit of co-parenting, rated "zero." The court found that Corbin should have had both his parents at the hospital but that due to his mother's actions, his father was not there. The court also found that Corbin should have had both parents at his chemotherapy treatments, but because Sharp decided that she would not let Keeler come back for the treatment, Corbin, to his detriment, was again denied his father's presence.

The trial court also found that Sharp was in contempt of court for failing to allow Keeler to exercise his court-ordered visitation, finding that Sharp's stated reason of having concerns about Keeler's care of Corbin after the medical procedures was "bogus" and "an extension of this problem that [Sharp has] with undermining [Keeler's] relationship with his son." Accordingly, in addition to the two days in jail that the trial court ordered for Sharp failing to allow Keeler the first right to babysit, the trial court ordered an additional two days in jail for Sharp's failure to allow visitation, but again suspended it on the condition that Sharp follow court orders.

The trial court held that Sharp had continued to damage Keeler's relationship with Corbin and had tried to prevent them from having a healthy bond, picking and choosing what part of the court orders she would follow, to the detriment of her son. It held that Sharp denied visitation for no reason; played "mind games" with Keeler regarding Corbin's medical procedures; and failed to advise Keeler of any medical information and procedures. The court further found a lot of Sharp's testimony to be "incredulous"

and untruthful. Based upon the testimony, the court found that there had been a material change in circumstances since the last hearing and that it was in Corbin's best interest for custody to be changed from Sharp to Keeler. The court noted that removing Corbin from the home that he had known since birth was not something that the court did lightly, but that Sharp had been failing Corbin miserably and that Sharp was unfit to be the custodial parent. The court stated that the change in custody was not a way to punish anyone, but rather it was for the best interest of the child. Explaining its decision, the trial court said that if it could "just send mom to jail for a couple of days and think that Corbin would be okay after that and get mom's attention to where she promotes the relationship between the son and the father and . . . didn't disregard Court Orders, pick and choose what she wanted, and I thought four or five days in jail would get mom's attention, then it would just strictly be a contempt issue, but it's more than that. I'm not changing custody in any way to punish mom. I'm doing it to protect this young man, little Corbin, who deserves to have two parents who love him." The trial court further ordered that Sharp undergo a mental-health examination and also ordered that Sharp have supervised visitation.

## I. Change of Custody

On appeal, Sharp argues that the trial court erred in changing custody of Corbin from her to Keeler. She complains that the court placed stricter requirements on her than the original custody order required and that the court failed to consider her diligent and consistent care for Corbin's health. She contends that the court erred in finding that she had engaged in parental alienation by not keeping Keeler completely informed prior to all medical procedures and by disallowing some visitation because she was not ordered to notify Keeler of medical appointments or procedures before they occurred and because when she denied visitation it was based upon health concerns for Corbin after he had received chemotherapy.

From our review, the trial court's extensive ruling from the bench does not indicate that it placed stricter requirements on Sharp than the original order required. Sharp's argument that she was not required to keep Keeler informed of Corbin's medical appointments and procedures prior to them occurring is simply not persuasive. Rather, her actions appear to be another way for her to have control over Corbin to the exclusion of Keeler. The same

rationale applies to visitation — Sharp was not to interfere with visitation unless it was an emergency, yet she took it upon herself to determine when Keeler was going to have visitation based upon her own subjective beliefs. As the trial court pointed out, Keeler is Corbin's father and there was no testimony that he was unfit to care for his child.

We find no error in the trial court's decision to change custody from Sharp to Keeler. The record is replete with Sharp's attempts to alienate Keeler from his son — for example, her refusal to keep Keeler apprised of medical information, especially in light of Corbin's serious medical conditions; her refusal to have Corbin ready for visitation; the fact that she refused Keeler visitation when she decided it was in Corbin's best interest to do so; and the fact that she did not allow Keeler the first right to babysit Corbin when she could not be with Corbin. The trial judge is the person in the best position to observe the parties and evaluate the witnesses, their testimony, and the child's best interest. *See Sheppard v. Speir*, 85 Ark. App. 481, 157 S.W.3d 583 (2004). It is obvious from the trial court's comments from the bench that it did not believe Sharp's testimony about why she did some of the things that she did nor her motivation behind some of her actions, and this was the trial court's determination to make.

The record of continued alienation of Keeler by Sharp is a material change of circumstances. Sharp failed to keep Keeler updated regarding Corbin's medical conditions. In addition to telephoning Keeler, Sharp had other ways of contacting him about Corbin's biopsy and surgery. For example, Sharp knew how to text message, as adduced by the testimony, yet she did not send the important information; rather she just kept leaving cryptic messages. She refused to allow the nurses at Arkansas Children's Hospital to divulge to Keeler more information than she decreed necessary, even after Keeler had to beg Sharp for the password to be able to be told any information about his son. Sharp changed Corbin's chemotherapy appointments and refused to let Keeler be present during the treatments. She denied visitation at times, although she said that she allowed some of it to be made up, and she would not have Corbin ready when visitation was supposed to begin. Sharp would not allow Keeler's wife or mother to pick Corbin up, although they were approved persons. On the whole, the evidence demonstrates a material change of circumstances since the entry of the initial custody order; the trial court found

that it was in Corbin's best interest to have custody changed to Keeler; and we cannot say that this decision was clearly erroneous.

■ Sharp also argues that custody was modified to punish her. We disagree. In its lengthy ruling from the bench, the trial court found Sharp to be in contempt of the court orders and sentenced her to four days in the Washington County jail, suspended on the condition that Sharp follow court orders. In changing custody, the trial court stated that the fact that it was removing Corbin from the home that he had known since his birth was not something that the court did lightly, but the court admonished Sharp that Sharp had been "failing [Corbin] miserably." Explaining its decision, the trial court found that there had been material changes in circumstances; it was in the child's best interest to change custody; and that if a person was not following court orders, that changing custody was not a way to punish anyone. The court explained that if it could send Sharp to jail for contempt for "a couple of days" and it thought that it would get Sharp's attention to the point that she would promote the father-son relationship and would obey court orders, then it would be strictly a contempt issue, but that this case was about more than just contempt. The court reiterated that it was not changing custody to punish Sharp, but rather to protect Corbin, who deserved to have two parents who loved him. Based upon our review of this ruling, we cannot say that the trial court changed custody simply to punish Sharp.

On this point, the dissent argues that this case was one of contempt, not change of custody. It is not either/or; it is both. We cannot ignore the fact that the trial court did hold Sharp in contempt on two separate bases. The record reflects that the court specifically noted that if it thought placing Sharp in jail for several days would cure the problem, then it would indeed simply be a contempt issue, but that this was in fact more.

## II.  Visitation

Sharp next argues that the trial court erred in awarding her supervised visitation and that the supervised visitation was only to punish her. In *Hass v. Hass*, 80 Ark. App. 408, 410-11, 97 S.W.3d 424, 426 (2003) (internal citations omitted), this court held:

> In reviewing domestic-relations cases, this court considers the evidence de novo, but will not reverse the trial court's findings

unless they are clearly erroneous or clearly against the preponderance of the evidence. It is well settled that the trial court maintains continuing jurisdiction over visitation and may modify or vacate such orders at any time on a change of circumstances or upon knowledge of facts not known at the time of the initial order. It is also well settled under Arkansas law that reversal is warranted where a trial court modifies visitation where no material change in circumstances warrants such a change. While visitation is always modifiable, our courts require a more rigid standard for modification than for initial determinations in order to promote stability and continuity for the children, and to discourage repeated litigation of the same issues. The party seeking a change in visitation has the burden below to show a material change in circumstances warranting the change in visitation. The main consideration in making judicial determinations concerning visitation is the best interest of the child. Important factors to be considered in determining reasonable visitation are the wishes of the child, the capacity of the party desiring visitation to supervise and care for the child, problems of transportation and prior conduct in abusing visitation, the work schedule or stability of the parties, and the relationship with siblings and other relatives. The fixing of visitation rights is a matter that lies within the sound discretion of the trial court.

The trial court found that in light of the "horrific testimony" that it heard, which rose to the level of harassment and torment and which was not in the child's best interest, that it had serious concerns about Sharp's mental health, and the court ordered that visitation be supervised. Sharp now argues that there was no evidence to support supervised visitation, and that the trial court ordered that only to punish her.

Following the February 24 hearing, Sharp promptly submitted to a psychological evaluation on March 9, the day before the order changing custody was entered on March 10. The psychological report was filed of record on April 3, the day before Sharp filed her notice of appeal. In that report, Dr. Martin Faitak, a clinical psychologist, summarized that Sharp tended to minimize problems and present herself in a positive manner; that she wanted positive regard but she might have difficulty with empathy and flexibility. However, he also noted that Sharp appeared to have good self esteem; that she was able to maintain employment, including soon to be adding a second job; that she was in good health and had appropriate expectations; that she had a stable mood; and that she had a sense of personal responsibility. Dr.

Faitak also commented that Sharp seemed to have many responsibilities for a twenty year old. He reported that it was difficult for him to know for sure about Sharp's mental-health issues because there was a possibility that she minimized them, and that it was unusual for someone with a history similar to hers not to have more "significant and pervasive emotional problems." He concluded that if what Sharp had reported was true, there was no need for individual counseling, and he recommended that she and Keeler obtain counseling and work together in order for them to be able to give Corbin the long-term support Corbin needed.

■ There is nothing in the psychologist's report to indicate that Sharp had mental-health issues that rendered her incapable of caring for Corbin during visitation. Furthermore, none of the evidence presented at the hearing revealed that Sharp had mistreated Corbin or neglected his needs during the time he was in her care. In short, we find that there was no evidence to support the trial court's decision that Sharp should only receive four hours of supervised visitation per week, and we hold that that decision was clearly against the preponderance of the evidence. We direct that the trial court award Sharp the same unsupervised visitation that Keeler enjoyed prior to the change of custody, all of which is set out in detail in the initial April 4, 2005 filed order.

Affirmed in part; reversed and remanded in part with instructions.

GLADWIN, ROBBINS, GRIFFEN, and MARSHALL, JJ., agree.

BAKER, J., dissents.

KAREN R. BAKER, Judge, dissenting. Upon review of the record in this case, I believe that the trial court's decision changing custody of this eighteen-month-old child from his mother to his father was clearly erroneous. I dissent due to my conviction that the majority misinterprets and misapplies our precedent regarding alienation of a child in custody disputes and because changing custody was not in the best interest of the child.

The majority's misapplication of precedent concerning alienation of a child is apparent in the majority's statement that the trial judge's decision was correct because "the record is replete with Sharp's attempts to alienate Keeler from his son." There are two problems with the this position. First, alienation has never been understood to mean alienation of a *parent*; rather, it has been

understood to mean alienation of the *child* from the parent. *See generally Turner v. Benson,* 59 Ark. App. 108, 953 S.W.2d 596 (1997) (Arkansas courts do consider whether one parent is *alienating a child* from the other parent when making custody decisions) (emphasis added); *Carver v. May,* 81 Ark. App. 292, 101 S.W.3d 256 (2003) (holding that, because a caring relationship with both parents is important to a healthy upbringing, evidence that one parent is *alienating a child* from the other is an important factor to be considered in deciding whether custody should be changed) (emphasis added). Although we have recognized that a vulnerable child may need protection from the attempts of a parent to alienate him from the other parent, a parent should be expected to be able to resist any attempt to alienate his affections for his own child.

Second, even if our court were to adopt a new standard, the trial court's finding that Sharp was alienating Keeler from this child was not supported by the evidence. Although Sharp's actions might have been irritating to Keeler personally, they were not the type of actions that have been recognized as having an alienating effect. *See Carver,* 81 Ark. App. at 299, 101 S.W.3d at 261 (appellant's interference with visitation was so extreme that the best interest of the children required that they be removed from the situation where there was no evidence to support appellant's drug-abuse allegations, and the sexual-abuse allegations were unsubstantiated; moreover, during the investigation, the children were subjected to medical sexual-assault examinations and were denied visitation with their father even after the investigation concluded that the allegations were unsubstantiated).

There was no evidence that this eighteen-month-old child was alienated from his father despite the majority's statement that "the record is replete with Sharp's attempts to alienate Keeler from his son." Alienation occurs when divorcing parents transform a child into a relationship weapon by engaging in patterns of behavior designed to destroy the child's psychological connection with the other parent. *See* Thomas E. Schacht, Psy.D., *Prevention Strategies to Protect Professionals and Families Involved In High-Conflict Divorce,* 22 U. Ark. Little Rock L. Rev. 565, 592 (2000). This type of behavior was not present in this case. The trial court and the majority focus on Keeler's lengthy testimony at a two-day hearing describing how he felt alienated from his son.

The majority notes that Sharp's attempts to alienate Keeler included her refusal to keep Keeler apprised of medical information, her refusal to have the child ready for visitation, her refusal of

visitation when she decided it was in the child's best interest, and the fact that she did not allow Keeler the first right to babysit when she could not be with the child. Great importance is also placed on Keeler's feelings concerning the use of the mother's surname rather than the father's last name.[1]

While the trial court's order stated that the parents were to communicate generally with each other about the health, education, and welfare of the child, there were no specific requirements that Sharp notify Keeler of any specific medical appointments or give him notice prior to any medical procedures. Moreover, the testimony showed that many attempts made by Sharp to inform Keeler of medical information were met with Keeler and his family members hanging up on her.[2] Moreover, the testimony showed that there was a period just after the child's biopsy that visits with Keeler were not allowed. Sharp testified that her decision was based on her concern for the child, as he had just been in the hospital and had a surgical procedure, and that he was still recovering. Once the child was diagnosed with hystiocytosis, he had to undergo chemotherapy, thereby weakening his immune system and requiring restricted access to the public. Testimony showed that the child became "clingy" with Sharp following chemotherapy treatments and would become upset when she left the room. Further, Sharp admitted that there were a couple of occasions when she did not call Keeler to babysit. However, she testified that on those occasions, the child was asleep, and she thought it would be disruptive to wake the child and take him to

---

[1] The first complaint cited by the majority, and used to justify their reasoning, is that the mother continued to use the name Sharp instead of Sharp-Keeler or simply Keeler. The mother did not appeal the order in which the name was changed, but the order specifically directed only that the child's birth certificate be changed — not that the mother ensure that all records maintained by third parties be changed.

[2] Regarding this testimony the trial judge in ruling from the bench stated, "The doctor .... tells you you've got an appointment at the bone doctor tomorrow in Little Rock, so you start calling [father]. You start calling him. Do you call him up and leave a message, oh my goodness, we have an appointment tomorrow at the bone doctor, we don't know what's going on, be there in Little Rock? No. You leave a little message that there's something wrong with his arm. Just enough to get this man worried .... Then you start calling his family to really stir it up and get everybody worried. And you call his mother up. I'm not surprised she's rude to you. Do you say, hold on, don't be mad, I'm just calling to let you know that little Corbin has a thing tomorrow."

Keeler's house for a short period of time.[3] Taken together, none of these actions amount to alienation of this child from his father. Yet, the majority concludes that because of Sharp's alienation of Keeler — not the child — a material change of circumstances existed to warrant a change of custody.

I dissent from the majority opinion for a second reason: it is clear that the trial court's ruling was intended to punish the mother for what the trial court saw as her "evil" behavior. In these cases, the primary consideration is the best interest and welfare of the child. *Carver*, 81 Ark. App. at 296, 101 S.W.3d at 259. All other considerations are secondary. *Id.* Custody awards are not made or changed to punish or reward or gratify the desires of either parent. *Id.*

Below are excerpts from the trial judge's oral ruling that demonstrate her intention to punish the mother by changing custody:

> Now, the other thing about the babysitting thing is that you don't consider your family to be quote/unquote babysitters, but yet when you send your child off to go with daddy you hand him a babysitter's guide. So you don't consider your family babysitting, but you consider this man a babysitter which is the most ludicrous thing that just undercuts this relationship between father and son and is huge evidence of parental alienation, and more importantly, of your undermining [the child's] relationship with his father to this little guy's detriment after I've told you not to. Then more evidence of contempt and parental alienation is that if this man shows up and the son is napping, he has to wait to pick him up until he wakes up, and I told both parties that he was to be ready at the time, and then he says that he's waited 5 to 20 minutes while you're changing him or putting him in his clothes or whatever. But then he testified, and this was not refuted by her testimony, that if [the child] is sleeping at his house and it's time to take him home, by golly, he better get awakened and taken over to mama's. It's like we play by Ms. Cyndall's rules or we don't play at all. So when he has to wait around to pick up [the child] if he's sleeping at mama's, that he doesn't get to make up his time most of the time. The worst

---

[3] Keeler testified that he was "offended" when Sharp gave him a book on babysitting. He stated that he was offended because he was the child's father, not a babysitter. It is noteworthy that in the trial court's order, it directs that Sharp give Keeler first right when she needs a *babysitter.*

testimony — well, there's so much bad testimony — one of the worst things that I heard today, Ms. Sharp, in addition to you denying this man visitation for no good reason, is this evil mind game thing that you're playing with him, and that would be text messaging about surgery and saying, pray for him on this surgery, and you send it out to different people. Let me — maybe counsel can help me about which one that is — but you send it out to everybody, and you never tell him that your son is going in for surgery, and when you're asked on cross-examination about that you say that you told him the time had come for your child to have ear surgery because he's had eight ear infections. Well, that tells me two things. That's well, when Ms. Cyndall speaks we're going to do what she says. And, number two, that tells me that you knew he had ear surgery lined up, that he's supposed to be the Ali Baba and have ESP and just know that you set up and appointment the day after his birthday for his ears to be — tubes in 'em, but you don't tell him. You don't tell him, and then when they ask you about what did you say, you try to say that this little e-mail that you sent out to everybody took care of letting him know that he was going to have surgery that day. Well, it didn't. It didn't advise him ahead of time. What it said was — let me find it. . . . "Everyone, thanks for all the prayers. Please continue to pray for [the child] during his surgery." You never tell him about the surgery. You just send this e-mail out that says "pray for him." Now, that is evil. That is so evil I can't even understand why you'd do that, and then when asked why do you do these little things, you say, well, I did it to let him know.

. . . .

[Mr. Keeler] doesn't know what's going on. Not only is that bad for [the child's] relationship to have daddy come to the clinic, and he's out there trying to come out of a groggy state, dad's upset and agitated, as well he should be because mom's sending out this little e-mail and she doesn't even tell him what's going on. That is so evil, and that is more evidence of parental alienation.

. . . .

The games that are being played, ma'am, are by you, and they are evil, and they are detrimental to your child, and I don't understand why you are doing it, and I'm ordering a psychological evaluation on you.

. . . .

> I'm not changing custody in any way to punish mom. I'm doing it to protect this young man, [the child], who deserves to have two parents who love him.

While the trial judge said that she was not changing custody to punish the mother, it is unclear how the change of custody was intended to protect the child. Throughout the trial court's thirty-five page oral ruling, it is clear that the judge was concerned with protecting Keeler from Sharp's "evil" behavior. The trial court's finding that the mother's lack of compliance warranted a change in custody allowed the court's desire to punish the mother to override the primary consideration in the case, which was the welfare of the child. *See Powell v. Marshall*, 88 Ark. App. 257, 197 S.W.3d 24 (2004) (citing *Hepp v. Hepp*, 61 Ark. App. 240, 968 S.W.2d 62 (1998); *Ketron v. Ketron*, 15 Ark. App. 325, 692 S.W.2d 261 (1985)). A violation of the court's previous directives does not compel a change in custody, *Carver, supra*. The majority outlines areas concerning the best interest of Keeler rather than the best interest of the child. This is evidenced by the statement that Sharp's "actions appear to be another way for her to have control over Corbin to the exclusion of Keeler" and that "there was no testimony that [Keeler] was unfit to care for his child."

While I agree that there was ample evidence of the immaturity of both parents in this case, I see no evidence supporting a finding that it was in the best interest of this eighteen-month-old child, while undergoing chemotherapy treatments, to be removed from his mother's care and given to his father, who until that time had never even had overnight visitation, and allowing only *four* hours of *supervised* visitation with his mother a week. As the majority recognizes, there was no evidence to support the trial court's decision restricting the mother's visitation to only two hours, twice a week, supervised. If the focus in these cases is truly the best interest of the child, this case should be reversed.

Accordingly, I dissent.