2011 Ark. App. 210

**Micah Mark MARCHAND, Appellant**

v.

**Rachel Campbell MARCHAND,
Appellee.**

**No. CA 10–767.**

Court of Appeals of Arkansas.

March 16, 2011.

Richard Ernest Worsham, Brooke F. Stern, Little Rock, for appellant.

James Earl Hensley, Jr., Little Rock, for appellee.

ROBERT J. GLADWIN, Judge.

Appellant Micah Mark Marchand challenges the Lonoke County Circuit Court's award of custody to appellee Rachel Campbell Marchand pursuant to the divorce decree filed February 5, 2010. Appellant contends that the trial court erred in determining that it was in the best interest of the parties' minor child to award custody to appellee. We affirm the trial court's decision.

## Statement of Facts

On January 10, 2008, appellee filed for divorce from appellant in Lonoke County Circuit Court wherein she sought custody of the parties' eighteen-month-old son. Appellant filed a counterclaim for divorce and also sought custody of the parties' child. Immediately subsequent to filing for divorce, appellee relocated to Mississippi and left the parties' minor child with appellant. There was testimony at the final hearing that appellee had planned to leave the state with the child without telling appellant, and there was testimony that appellant kept the child from appellee after hearing of her plan.

On February 11, 2008, a temporary hearing was held that resulted in entry of a temporary order on March 10, 2008. Among other things, the temporary order awarded the parties joint-legal and joint-physical custody of the minor child, with the parties alternating custody of the child on a weekly basis. The temporary order also found appellee to be in contempt of the trial court's restraining order and included several standard prohibitions, such

as prohibiting overnight guests of the opposite sex in the presence of the child.

For approximately one-and-a-half years, the parties exercised a literal joint-custody arrangement as ordered by the trial court, until the child was about three years old. Appellee continued to reside in Mississippi, and appellant continued to reside in Arkansas. Then, on October 28, 2009, the trial court held the final divorce and custody trial. Each party testified regarding their routines with the child, and both accused the other of having extra-marital affairs.

Appellee has a daughter from a previous marriage, and appellee and her two children live in a mobile home on property owned by her parents. Appellee's parents live next door, and her grandmother lives close by as well. Appellee is a registered nurse and works at Southwest Mississippi Regional Medical Center in the cardiovascular-surgical unit. She also works part time as a paramedic. Appellee works thirty-six hours per week during three twelve-hour shifts, taking night shifts when her son is visiting appellant. Her schedule is flexible, and her parents and sister help her with the children.

Appellee testified that it was difficult to talk to appellant about their son. She said that she encouraged her son to be excited about visitation with his father and that the child loves his father. She claimed that she does not speak ill of appellant around the child. Appellee testified that neither she nor appellant spank the child.

Appellee admitted to having a serious boyfriend, even though her divorce was not final, but claimed that her boyfriend had never spent the night when the child was present because the restraining order prevented it. She stated that she did not believe having her boyfriend around her child set a bad example for the child. Appellee claimed that appellant spent an inordinate amount of time playing Warhammer, a game involving miniature, painted figures set up on a large game table. She stated that appellant is an instructor in the military, that he is a sniper, and that he kept guns and ammunition for his job at his house.

Appellee testified that appellant held a loaded pistol to his head and threatened to blow his brains out when she tried to leave him in March 2007. She claimed that appellant was controlling and had loaded an excessive amount of pornography into all three computers in the house, including her daughter's computer. She testified that appellant was never sexually satisfied and that he began going to Sex Addicts Anonymous before she left him. She admitted to making a pornographic video for appellant.

Appellee also admitted to being hospitalized for taking eight pills—Percocet and Dora Tab—in 2004. She explained that appellant was in Iraq and that she was depressed because she and appellant had been fighting. She claimed that she did not intend to kill herself, but, that she had had enough and "just wanted to sleep." She said that she now takes Wellbutrin, an antidepressant.

Appellee stated that in her attempts to get appellant home from Iraq, she exaggerated her claims regarding her father's abusiveness and her mother's bad personality traits. She denied opening an account for appellant on adultfriendfinder.com, even though her bank records showed that the account was charged to her credit card. Appellant denied paying for the adultfriendfinder.com account and stated that he did not have access to appellee's bank account.

Appellant testified that he communicates with appellee very well when it comes to their son. He stated that when the child

comes back to his house, it takes several days to get him in the routine of going to the bathroom without accidents. Also, he said that it takes the child a while to begin obeying him without argument.

Appellant testified that he did not know appellee's boyfriend but did not want the child confused by having to associate with the boyfriend. Appellant claimed that appellee was the one convinced that he had a sex addiction and that the only reason he sought professional help was so that he could work things out with appellee. He stated that he went to a mental-health clinic at the air base and that the therapist he saw did not believe that appellant had a sex addiction.

Appellant explained that appellee is the one who insisted on having a child when he felt that they were not financially stable. He blamed her constant telephone calls and insistence on having a child for the decision to leave his employment in December 2003. He testified that he could not obtain another job because he got deployment orders for April, and no one would hire him knowing he would soon be deployed. He testified that he injured his back in Iraq, and because of that injury, he is no longer subject to being deployed. He works as an instructor from 7:00 a.m. to 3:30 p.m., Monday through Friday, and he takes the child to daycare.

Appellant denied being obsessed with the Warhammer game and stated that he only models or paints when the child is asleep or at appellee's house. He also denied ever having put a gun to his head while being married to appellee. He explained that because he was non-deployable, he would be less likely to be able to relocate to the Mississippi base or the Mississippi National Guard.

Appellant testified that he lives in a house where the child has his own bedroom and bathroom, and the yard is fenced in back. The child has a friend his age who lives next door and plays with him all the time. Appellant claimed that there were about eighteen children in the neighborhood that were between the ages of thirteen and two.

Appellant also stated that he did not know how it would work out if appellee won custody. He said that if appellee ever wanted to come to Cabot to see the child, that was fine. He said that he was not opposed to appellee being around the child. He insisted that appellee attempted to secret the child out of the state when she moved to Mississippi. He also claims that she took his personal firearms and some belonging to the National Guard but eventually returned them.

Dr. Paul Deyoub, a forensic psychologist, prepared a report after interviewing both parties and gave a recommendation to the trial court that appellee be awarded custody of the child. The parties had completed a series of written psychological tests and were interviewed by Dr. Deyoub. Dr. Deyoub explained that appellant had some personality problems regarding his infidelity and possible sexual addiction. He explained that appellant had issues related to impulsivity and that some test scores indicated unusual elevations on the schizophrenic scale, although appellant was not schizophrenic. Further, Dr. Deyoub testified that the tests indicated that appellant had some obsessive-compulsive traits or controlling-type traits.

Dr. Deyoub testified that appellee had a history of some depression and was taking medication for that. He said that appellant's personality traits related to his behavior and appellee's depression related to her feelings. Dr. Deyoub acknowledged that appellee had an incident, before she had the child at issue, when she had been hospitalized for an overdose. He said that

he took into account the fact that appellee takes medication for her depression.

Dr. Deyoub stated that either party in the absence of the other would be capable of raising the child. He recommended that appellee have custody because she had been the primary caretaker for both of her children, the child would not be separated from his sister, and that there was no compelling reason not to recommend that the mother have primary custody. He stated that she was not unfit in any way, she has the opportunity for stability in Mississippi, she has family support, she had a flexible job, and she had a plan for the care of her children.

Appellant presented several witnesses including two neighbors of the parties who both testified to appellant's character and his overall good parenting of the minor child. Appellant also introduced the intake person at the child's doctor's office, who testified that it was almost ₇always appellant who took the child to the clinic, and ninety-nine percent of the time, appellant brought the child in on his own. Appellant also called two acquaintances, one who was his former supervisor, who testified about appellant's strong character and good parenting skills. Appellant called a daycare worker at the facility where the minor child attended daycare in Arkansas. She testified that appellant did well with the minor child and was a "hands-on" father. The parties stipulated that appellee's parents would testify as appellee had.

After taking the matter under advisement, the trial court entered a Decree of Divorce finding that it was in the best interest of the child that the parties share joint-legal custody of the minor child with appellee having physical custody. Appellant was granted one week of visitation per month and extended summer and holiday visitation. Appellant subsequently filed a motion to reconsider (for a new trial), and appellee responded. The motion to reconsider was deemed denied by the trial court after thirty days. Appellant then filed a timely notice of appeal from the order, and this appeal followed.

*Standard of Review*

We review child-custody cases de novo, but we will not reverse a circuit court's findings unless they are clearly erroneous. *Ross v. Ross,* 2010 Ark. App. 497, 2010 WL 2404168. A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *Ford v. Ford,* 347 Ark. 485, 65 S.W.3d 432 (2002). Because the question of whether the circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the trial judge to evaluate the witnesses, their testimony, and the child's ₈best interest. *Sharp v. Keeler,* 99 Ark. App. 42, 256 S.W.3d 528 (2007). There are no cases in which the superior position, ability, and opportunity of the trial judge to observe the parties carry as great a weight as those involving minor children. *Bailey v. Bailey,* 97 Ark.App. 96, 244 S.W.3d 712 (2006). The primary consideration in child-custody cases is the welfare and best interests of the child involved; all other considerations are secondary. *Hicks v. Cook,* 103 Ark.App. 207, 288 S.W.3d 244 (2008).

*Discussion*

Appellant sets forth five reasons he believes the trial court erred in finding that it was in the child's best interest to award custody to appellee. First, he contends that appellee failed to produce any lay witnesses, other than herself, for the trial court's consideration in support of her bid for custody. He admits that the par-

ties agreed to stipulate that appellee's parents would testify to the same information that appellee testified, but argues that there were no coworkers, friends, family, or others to testify as to her relationship with the child, her participation in custodial duties, or any other factor.

Appellee points out that the stipulated witnesses address appellant's concerns. Further, there was no mention made by appellant nor the trial court during the trial regarding the number of witnesses called by appellee. We agree.

Second, appellant argues that there were numerous witnesses presented in support of his proposition that it is in the best interest of the child for custody to be awarded to him over appellee. He points to the positive testimony of his neighbors, the doctor's office employee, his former supervisor, and the child's daycare worker. He emphasizes that the deposition of the social worker where appellee had been an inpatient in 2004 is proof that appellee has had ongoing mental-health issues, including two suicide attempts. He submits that he introduced appellee's prior counselor, who stated that appellee never disclosed to her that appellee had been hospitalized for a suicide attempt. He also points to the law-enforcement officer's testimony that contrasted his calm demeanor with appellee's unwillingness to cooperate.

Appellee contends that these witnesses offered weak evidence and lacked specificity. For example, she claims that the neighbors' testimony that appellant was a good parent was broad and conclusory. Further, she argues that the doctor's-office employee did not say anything other than appellant was the one who brought the child to the clinic and that the child would sit with appellant and giggle and play. We agree that this evidence does not support either party, but reflects ordinary behavior expected of every parent.

Third, appellant claims that Dr. Deyoub's recommendation to award custody to appellee was based primarily upon appellee's lies and fabrications. Appellee had indicated to Dr. Deyoub that her family would be helping her by providing daycare and other critical support. However, on cross examination, Dr. Deyoub admitted that the description of appellee's parents as described by appellee in her own email was different than what was portrayed to him by appellee. In an email to appellant, appellee had described needing a more supportive environment than the one she had when she was living with her parents. However, she portrayed her family as supportive to Dr. Deyoub. Appellant claims that this is inconsistent and was appellee's attempt to use deception to manipulate the outcome of the case. Appellant contends that Dr. Deyoub did not have appellee's mental-health records at the time he decided to recommend that appellee have custody.

Appellee points out that Dr. Deyoub was examined vigorously by the attorney ad litem. The ad litem advised Dr. Deyoub of appellant's allegations, and he did not modify his recommendations. Dr. Deyoub stated that, even if appellee did not have family support, she would be responsible for the children. He discussed the need to put all issues in perspective regarding a family consolidating around a grandchild during a divorce. Dr. Deyoub was advised of appellee's mental-health history, and such claims by appellant were insufficient to warrant Dr. Deyoub's changing his recommendation one-and-a-half years after his evaluation and report.

Fourth, appellant claims that appellee acknowledged multiple instances of inappropriate and unacceptable behavior. He points out that she admitted that she planned to remove the child from his daycare and run off to Mississippi without

telling appellant, despite the restraining order. Also, he claims that she admitted to having made multiple pornographic videos, had watched pornography, and had also been involved in multiple extra-marital relations. He asserts that she stated that there was nothing wrong with her boyfriend staying the night at her home when she is exercising custody of the child. He claims that she acknowledged that her boyfriend stays there when her daughter is at home, and she does not let the boyfriend stay when the son is home only because of the restraining order. Finally, he states that she admitted that she violated the restraining order and failed to pay the trial court's contempt fine.

Appellee claims that, to her knowledge at the time, no case had been filed and she was within her right to take the child with her to Mississippi. She contends that appellant disallowed any contact with her son until her attorney was able to secure a temporary hearing. Appellant did not allow her to see her son for a month. She further claims that the one pornographic movie made by her was at his behest when he was deployed. She admits that a second video of both parties was made, claiming it was a desperate act of a wife trying to keep her wandering husband from having affairs. She admits that she had one affair before the child was born but asserts that it is appellant who trivializes his addiction to sex and porn, which resulted in serial affairs. She maintains that after a twenty-two month separation, having a boyfriend is not unreasonable. And finally, she contends that she did not willingly violate the order to pay a $500 attorney's fee, but was unable to pay the fee. Given this contradictory evidence, the trial court was forced to make a determination as to credibility, which will not be overturned by this court unless that determination is clearly erroneous. We affirm the trial court's decision, despite appellee's acknowledgements.

Fifth, appellant argues that appellee made multiple efforts to deceive the trial court and manipulate the outcome of the case. He claims that an order to compel had to be issued to require her to execute a medical release; that she has continuously denied her mental-health problems and numerous suicide attempts; that she has continued to deny her family problems and claims to have strong family support when she does not; that she was deceitful regarding her "alcohol abuse problem"; and that she continuously resisted production of one month's bank statement, which revealed that she had used her account to register appellant for an internet dating site.

Appellee denies making multiple efforts to deceive the trial court and to manipulate the outcome of the case. She contends that appellant's claims are conclusory and repetitious. She cites other cases showing comparatively worse behavior on behalf of the custodial parent that were affirmed by this court. *See Shively v. Plautz,* 2009 Ark. App. 752, 2009 WL 3762921 (where mother engaged in behavior that interfered with the father's visitation and Dr. Deyoub recommended change of custody, but trial court affirmed custody in the mother not to be changed); and *Valentine v. Valentine,* 2010 Ark. App. 259, 377 S.W.3d 387 (where trial court was concerned at mother's adulterous behavior before and after divorce, but let stand the previous custody order). Appellant points out that these two cases are change-of-custody cases, not initial-custody determinations.

We agree that the issue before the trial court in this initial-custody determination was what was in the best interest of the child, not whether a material change of circumstances had occurred that would

warrant a custody change. Because the question of whether the circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the trial judge to evaluate the witnesses, their testimony, and the child's best interest. *See Sharp v. Keeler, supra.* Given that deference, we hold that the trial court's award of custody to appellee was not clearly erroneous.

Affirmed.

WYNNE and GLOVER, JJ., agree.