Cyndall SHARP *v.* M.J. KEELER

CA 07-1027                                           288 S.W.3d 256

Court of Appeals of Arkansas
Opinion delivered October 1, 2008

[Rehearing denied November 12, 2008.*]

---

* HART and HEFFLEY, JJ., would grant rehearing.

234

*Brenda Austin, Ltd.*, by: *Brenda Horn Austin*, for appellant.

*Matthews, Campbell, Rhoads, McClure, Thompson & Fryauf, P.A.*, by: *George R. Rhoads* and *Sarah L. Waddoups*, for appellee.

D.P. MARSHALL JR., Judge. This extraordinarily contentious custody case returns to us. The core issue is who should have custody of C., a four-year-old boy. Appellant Cyndall Sharp is C.'s mother; appellee M.J. Keeler is the boy's father. Sharp and Keeler were never married. In the first appeal, we affirmed the circuit court's decision changing custody of C. to Keeler, but reversed the court's requirement that Sharp's visitation with her son be supervised. *Sharp v. Keeler*, 99 Ark. App. 42, 256 S.W.3d 528 (2007)(en banc). While the case was on appeal, the parties continued litigating about visitation and custody in the circuit court. We now have before us Sharp's appeal from the circuit court's March 2007 orders denying her motion to change custody back to her and holding her in contempt for violating court orders. Sharp also challenges an evidentiary ruling, which excluded some proposed expert testimony. At the end of the proceedings in 2007, the circuit court ordered both Sharp and Keeler to spend four days in jail for willfully violating the court's orders. Keeler has not appealed the contempt ruling.

There is a preliminary, but nonetheless important, point. The circuit court did not have the benefit of our mandate in *Sharp I*, which issued in May 2007, when it entered the March 2007 orders now being challenged. In one of those orders, and on Keeler's motion, the circuit court expanded supervision of Sharp's visitation. Sharp does not challenge this part of the order. Keeler does not defend the supervised visitation, and says that this issue became moot after our first decision. We take all of this to mean that the circuit court and the parties are honoring our *Sharp I* mandate in letter and spirit, *Williams v. State*, 100 Ark. App. 199, 201-02, 266 S.W.3d 213, 215-16 (2007), and that Sharp's visitation is not being supervised in any way.

I.

We reject Sharp's main point. The circuit court did not clearly err by concluding in March 2007 that no material change in circumstances had occurred since the original custody order. *Campbell v. Campbell*, 336 Ark. 379, 384-88, 985 S.W.2d 724, 727-29 (1999). The facts that led the circuit court to change custody of this boy from his mother to his father in March 2006 are discussed in detail in this court's thorough en banc opinion in *Sharp I*. 99 Ark. App. at 54-56, 256 S.W.3d at 536-38. Sharp acknowledges that she had the burden of proving a material change in circumstances during the year between the two orders. After

three days of testimony, the circuit court concluded: "I find that the petitioner, Ms. Sharp, has failed to meet her burden of proof with respect to a material change in circumstances. The only thing that she's proven today is that the parties still cannot get along." We agree. And we see no useful purpose in describing the many ways large and small in which Sharp and Keeler have refused to cooperate with one another and have made each other's life unnecessarily difficult.

During its 2007 bench ruling, the circuit court reminded Sharp that, "I changed custody [to Keeler in 2006] because I found that you were alienating parental affections from father to son and vice versa. Now, it wasn't at that time you just not getting along with Mr. Keeler. That you continued to take action to the detriment of your son." This harm and alienation was the basis for our affirmance of the March 2006 order changing custody from Sharp to Keeler. *Sharp I*, 99 Ark. App. at 54-56, 256 S.W.3d at 536-38.

In 2007, the circuit court acknowledged that Sharp and Keeler still did not get along and were still disobeying court orders. The court held Keeler in contempt for interfering with visitation, having Sharp removed by security during a hospital visit, and other bad behavior. Keeler served four days in jail for these actions and has not appealed his contempt citation. But the court also found that, unlike in the prior round, the custodial parent's actions were not harming C.

In its detailed ruling, the court pointed to particular events that differentiated Keeler's recent bad conduct from Sharp's earlier actions. Among "several alarming things," first was the fact that Sharp "admitted at the February '06 hearing to lying about your son being in the emergency room to teach this man a lesson, which goes far beyond the little games that you two had previously been playing back and forth." Second, in the earlier round of litigation, the court "found [Sharp] to be unfit because she had [C.] in the middle of a slapping contest between her and her mother, and her mother was charged with felony battery to a child and [Sharp] still allowed her mother to babysit little [C.]" These are some of the circumstances that led the circuit court to conclude that Keeler's recent misbehavior, though similar to Sharp's past actions, was not identical in either quality or effect on the child. Sharp does not argue that our decision in the first appeal somehow mandates — as a matter of precedent, equal treatment, or anything else — another custody change in her favor.

■ Nor did the circuit court find that Keeler's recent actions were alienating C. from Sharp. The court concluded that "the decisions [Keeler is] making in violating court orders, I haven't heard anything that it's causing little [C.] to have a rough time or not be in his best interest . . . ." Precedent requires that we defer to the circuit court's findings in this "he said and did" — "she said and did" controversy about custody. *Word v. Remick*, 75 Ark. App. 390, 394, 58 S.W.3d 422, 424-25 (2001). And the circuit court's most recent conclusion that, notwithstanding his poor behavior, Keeler is not harming C. or alienating the boy from his mother is not clearly against the preponderance of the evidence. *Harris v. Grice*, 97 Ark. App. 37, 38, 244 S.W.3d 9, 11 (2006).

■ Sharp also argues that the circuit court erred by making her prove that changing custody was in C.'s best interest. No reversible error occurred here. Our law imposes this burden on Sharp because she sought the custody change. *Brown v. Ashcraft*, 101 Ark. App. 217, 220, 272 S.W.3d 859, 862-63 (2008). We likewise see no clear error in the best-interest finding. *Harris*, 97 Ark. App. at 38-42, 244 S.W.3d at 11-14.

We are not chancellors. Our standard of review, faithfully applied, decides this case. *Harris*, 97 Ark. App. at 38, 244 S.W.3d at 11; *see also Hicks v. Cook*, 103 Ark. App. 207, 215, 288 S.W.3d 244, 250 (2008) (Marshall, J., concurring). The question presented is not: what would we have decided as the finder of facts? The circuit judge has presided over this poisonous dispute since 2004. In the most recent round, the parties made a record of more than five hundred pages during several days of trial. As the circuit judge said in preface to her comprehensive oral findings, "I have been able to observe both of the parties testify and see their demeanor and see their expressions and hear their testimony and hear their stories." The trial court has had a front-row seat at these parents' long-running tug of war. We are, and should be, duty bound to defer to the trial court's better vantage point for discerning what custody arrangement between these contending parents is best for this child. *Sharp I*, 99 Ark. App. at 43-44, 55, 256 S.W.3d at 529, 537.

## II.

We also reject Sharp's second main argument — that the circuit court abused its discretion by limiting the testimony of Dr.

Martin Faitak. The circuit court appointed Dr. Faitak to perform a psychological evaluation of Sharp. He did so, and testified about his findings and conclusions. He also testified about the impact that Sharp's and Keeler's hostility toward each other had on C. The court did not allow Dr. Faitak to testify about two things: his opinion about a videotape of Sharp allegedly inappropriately touching C. while changing his diaper, and his opinion about Keeler's mental health. We see no abuse of the circuit court's broad discretion in either evidentiary ruling. *Aswell v. Aswell*, 88 Ark. App. 115, 122, 195 S.W.3d 365, 369 (2004).

First, Dr. Faitak was not present when the videotape was made. Keeler's mother — a court-approved visitation supervisor — was present and testified about the incident. Sharp also testified about it. And the circuit judge watched the videotape. In light of all this evidence about the events portrayed on the videotape, we conclude that the circuit court did not abuse its discretion by excluding Dr. Faitak's proposed testimony about his impressions of it. *Aswell*, 88 Ark. App. at 122, 195 S.W.3d at 369.

Nor did the court abuse its discretion by excluding Dr. Faitak's testimony about Keeler's mental health. *Ibid*. Dr. Faitak was appointed to evaluate Sharp, not Keeler. The circuit judge observed Keeler throughout the hearings just as Dr. Faitak did. She allowed Dr. Faitak to testify about the distrust between the parties, give his opinion — based on Keeler's testimony — about Keeler's lack of desire for collaborative counseling, and testify about the potential effect of the parents' strained relationship on C. Given that Dr. Faitak had not evaluated Keeler, and given all the detailed evidence already in the record about Keeler's actions toward Sharp, we see no abuse of discretion in excluding Dr. Faitak's proposed testimony about Keeler's mental health. *Ibid*.

### III.

Finally, we come to contempt. At the end of its bench ruling, the circuit court held both parties in contempt for violating its prior orders. The court had held Sharp in contempt for the same reason the year before, but had "suspended" her sentence. After reciting their particular violations, the court sent both Keeler and Sharp to jail for four days directly from the last hearing. Both served their sentence. Keeler does not appeal his contempt citation, but Sharp challenges hers.

Sharp served her sentence, which mooted the contempt issue. *Swindle v. State*, 373 Ark. 518, 522-23, 285 S.W.3d 200, 204

(2008) (collecting cases). We may and do address the contempt issue, however, because it may arise again and it is practically impossible to get immediate appellate review of an order sending someone to jail for contempt directly from a hearing. *Swindle, supra.* Because our decision cannot affect the time Sharp has already served in jail, if we agree with her argument against the contempt citation, then we will declare error rather than reversing the order. *Ibid.*

The circuit court entered a separate order of contempt. It provides, as to Sharp, that:

> 1. Both parties have been admonished by this Court at numerous hearings about the importance of following court orders. However, the parties still are violating, willfully, the court's orders.

> 2. The Court hereby invokes the four (4) days in the Washington County Jail which was previously suspended. The Court finds that Cyndall Sharp willfully disobeyed court orders since Feb 24, 2006 by: not following the supervision terms for visitation, threatening to take [C.] to the ER when not necessary, harassing the child's father and family by videotaping visits, and using hidden cameras, driving by father's house w/o reason.

> The Court sentences Cyndall Sharp to four (4) full days in the Washington County Jail to be served immediately, with NO TRUSTEE status, to be released on Saturday, March 10, 2007, at NOON.

Sharp argues that, while willfully disobeying a court order outside the court's presence may be criminal contempt, she was entitled to notice of the accusation and a reasonable time to make her defense. Ark. Code Ann. § 16-10-108(a)(3) & (c) (Supp. 2007); *see also Fitzhugh v. State,* 296 Ark. 137, 140, 752 S.W.2d 275, 277 (1988). The key statutory provision is § 16-10-108(c): "Contempts committed in the immediate view and presence of the court may be punished summarily. In other cases, the party charged shall be notified of the accusation and shall have a reasonable time to make his or her defense."

Because neither a motion for contempt nor an order to show cause was pending, Sharp says she had insufficient notice. She also argues that the circuit court's prior orders were not specific enough to support a contempt citation for the actions relied on by

the court. Keeler responds that the court's prior orders put Sharp on notice: she attempted to evade the supervision specifically ordered, and she harassed him in various particular ways contrary to the court's general order that neither party should harass the other.

■ We declare error on the criminal contempt citation. Though it is not a basis for our decision, we point out that a sentence for criminal contempt may not be suspended indefinitely. "[A]n attempt to suspend the execution of a sentence for contempt of court, other than a mere postponement, is invalid and amounts to a complete remission of the punishment." *Higgins v. Merritt*, 269 Ark. 79, 80, 598 S.W.2d 418, 419 (1980). The reversible error here was the lack of notice required by the statute. The circuit court gave Sharp ample and repeated notice from the bench in the first round of litigation that she must obey the court's orders or she would be jailed for contempt. But Sharp did not have notice — either by motion, show-cause order, or statement from the bench during any of the last hearings — that Keeler or the court was accusing her at that time of acting contemptuously in the various particular ways adjudicated in the contempt order. The earlier citation, having been remitted by its suspension, cannot fill this gap. The court's orders for supervised visitation and against harassment were a necessary condition for a contempt finding, Ark. Code Ann. § 16-10-108(a)(3), but not a sufficient condition. Sharp was entitled to notice of specific accusations and then a reasonable time to defend before the court decided the contempt issue. Ark. Code Ann. § 16-10-108(c). The circuit court's summary citation — while understandable in light of the parties' egregious behavior — was error.

Affirmed in part, error declared in part.

GLADWIN, GRIFFEN, and GLOVER, JJ., agree.

HART and HEFFLEY, JJ., dissent.

JOSEPHINE LINKER HART, Judge, dissenting. The genius of the American system of government is that it is structured to prevent any one individual from exercising unbridled discretion. That is the purpose of judicial review. The Arkansas Constitution guarantees every citizen the right to have a decision made by one trial judge reviewed by a panel of judges; in this case, six judges ultimately participated. Moreover, it is not sufficient that three or more judges

agree or disagree with the trial court. As a further safeguard, the system of review requires that the vote of the reviewing judges be justified by written opinion, setting out the legal basis for the decision. Integral to setting out the legal basis of a decision is the doctrine of *stare decisis*, a convention that requires courts to abide by settled decisions. These written decisions show the litigants, the bar, and the public at large that an important decision like a child-custody determination is not the product of improper influences — for example, friendship with the trial judge, bitterness left over from a judge's own contentious divorce, the desire to court political favor, a lack of effort to properly review the record, failure to find and apply the relevant law, or simply limited legal acumen or experience. It is not a perfect process, but one that consistently yields predictable results — what we may humbly call justice. I am deeply troubled that the process has failed today.

The dearth of facts recounted in the majority's ten-page opinion is misleading in the extreme. The three-day hearing produced more than 550 pages of testimony. The court's order, at the direction of the trial judge, included twenty-eight pages of "findings" made from the bench. To affirm this case because the majority agrees with a single sentence from the trial court's "findings" that acknowledges that the parties "cannot get along" is astoundingly disingenuous. The very reason we have lawsuits at all is because the parties cannot get along!

I submit that today's majority can "see no useful purpose in describing the many ways large and small in which Sharp and Keeler have refused to cooperate with one another and have made each other's life unnecessarily difficult," not because these facts are not legally significant — clearly they are — but because these facts make their decision today undefendable. It is undefendable because today's majority, which constituted four-fifths of the court that *affirmed* the trial court's change of custody from Sharp to Keeler in *Sharp v. Keeler*, 99 Ark. App. 42, 256 S.W.3d 528 (2007) — *Keeler I*, and by their own reckoning, they discussed Ms. Sharp's transgressions "in detail in this court's thorough *en banc* opinion in *Sharp I*." Apparently they see no problem in recounting facts "in detail" when the facts support their position, and see no need to be "thorough" when the facts are hard to explain away.

The law seems to be a problem for the majority as well. In *Keeler I*, the majority held that an attempt to "alienate Keeler from his son" was both a material change of circumstances and proof of

best interest of child to change custody. 99 Ark. App. at 55, 256 S.W.3d at 537. In *Keeler I*, the offending conduct was Sharp's "refusal to keep Keeler apprised of medical information, especially in light of [C.K.'s] serious medical condition, her refusal to have [C.K.] ready for visitation, the fact that she refused Keeler visitation when she decided that she did not allow Keeler the first right to babysit [C.K.] when she could not be with [C.K.]." *Id.*

In the instant case, Keeler not only failed to keep Sharp "apprised" of C.K.'s medical information, but actually had Sharp removed from the hospital by security officers when Sharp showed up at her child's appointment. It is not disputed that C.K. screamed for his mother as Keeler directed that security guards remove Sharp from out of the hospital. I submit that this undisputed evidence of how Keeler's conduct obviously affected C.K. is more significant than a nasty text message sent from one parent to another! Finally, Keeler also brazenly, and without any valid reason, cut off Sharp's visitation when she had the foresight to videotape her visit, apparently to head off abuse allegations by Keeler's family.

Remarkably, today's majority justify ducking these facts by insouciantly declaring that "precedent requires that we defer to the circuit court's findings in this 'he said and did' — 'she said and did' controversy about custody."[1] This not-so-deft sidestep ignores the fact that there is absolutely no dispute that Keeler engaged in that reprehensible conduct, and the trial court's finding that the majority purports to defer to was that Keeler was "doing all the things that Ms. Sharp was doing the last time we were here." The testimony of *both sides* supports this finding!

Today's majority cites no authority for the proposition that we are "duty bound to defer to the trial court's better vantage point," save their own wrongly decided opinion in *Sharp I*, which they apparently think stands for the proposition that anything a trial judge decides in a custody case is copacetic with the majority. They are wrong.

It is axiomatic that in child-custody cases, we only defer to the trial judge's superior position to determine the credibility of

---

[1] The writing judge cites *Word v. Remick*, 75 Ark. App. 390, 58 S.W.3d 422 (2001), as support for this proposition. However, *Word* is completely inapposite. In *Word*, there was a "sharp dispute" in the evidence, while in the instant case, Keeler freely admitted that he engaged in his reprehensible conduct.

witnesses. *See, e.g., Bridges v. Bridges*, 93 Ark. App. 358, 219 S.W.3d 699 (2005); *Hurtt v. Hurtt*, 93 Ark. App. 37, 216 S.W.3d 604 (2005). Unfortunately, my research indicates that it is not the first time that an opinion from this court has attempted to alter the standard of review by misstatement. I have traced this error to an opinion authored by this scribe. In *Brandt v. Willhite*, 98 Ark. App. 350, 255 S.W.3d 491 (2007), he attributed the standard-of-review to *Hollinger v. Hollinger*, 65 Ark. App. 110, 986 S.W.2d 105 (1999). I note, however, that the standard of review in *Hollinger* was stated as follows:

> Chancery cases are tried de novo on appeal. *Riley v. Riley*, 45 Ark. App. 165, 873 S.W.2d 564 (1994). We will not disturb a chancellor's findings unless they are clearly against the preponderance of the evidence. *Stone v. Steed*, 54 Ark. App. 11, 923 S.W.2d 282 (1996). Since the question of preponderance of the evidence turns largely on the credibility of the witnesses, we defer to the superior position of the chancellor. *Watts v. Watts*, 17 Ark. App. 253, 707 S.W.2d 777 (1986). We know of no cases in which the superior position, ability, and opportunity of the chancellor to observe the parties carries as great a weight as those cases involving children. *Id.* A finding is clearly erroneous or clearly against the preponderance of the evidence when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Nichols v. Wray*, 325 Ark. 326, 925 S.W.2d 785 (1996).

65 Ark. App. 110, 112, 986 S.W.2d 105, 106, but in *Brandt v. Whillhite*, that language was reduced to:

> In reviewing the circuit court's decisions, we defer to that court's superior position for measuring the witnesses' credibility and evaluating what was in the child's best interest.

98 Ark. App. 350, 353, 255 S.W.3d 491, 493. This quote is a misstatement of the law. We defer to the trial court's credibility determinations, but the findings regarding best interest of the child are reviewed de novo.[2] The outcome of this case should not be a surprise given the majority's demonstrated lack of understanding of well-settled law.

---

[2] Interestingly, the three-judge panel in *Brandt v. Willhite*, did apparently conduct a proper review of the case, reversing the trial judge's finding on best interest of the child because the "evidence" contradicted the circuit court's "conclusion."

But the issue here is not only the quality of the opinion but the result. I lament that today's majority thinks that it is acceptable to treat two parties differently when the parties engaged in the *same conduct*. The Constitution guarantees all litigants equal treatment under the law. I am appalled that today's majority actually states that they are free to deny Ms. Sharp equal treatment under the law *in this court* and excuse their action by asserting a procedural rule.

Finally, I note that today's majority, the same judges less one who were the majority in *Keeler I*, have at least implicitly repudiated their remarkable decision of just fifteen months ago in *Keeler I*, notwithstanding their failure to acknowledge that is what they are doing. Given the majority's failure to properly apply the standard of review, insubstantial legal or factual justification for their decision, and employment of what seems to be a "double standard" in treating similarly situated litigants of different genders, I decline to speculate as to why today's majority decided to affirm this case; I suspect that the litigants, the bar, and the public at large will not be so indulgent.

SARAH J. HEFFLEY, Judge, dissenting.  Our standard of review requires us to defer to the trial court on matters of credibility and to affirm when the trial court's decision is not clearly against the preponderance of the evidence. We thus place a great deal of trust, and rightly so, in our trial courts to protect the best interest of children in making custody decisions. While the primary responsibility lay in the trial court, it is no less our duty to ensure that the trust reposed in the trial court is carried out faithfully and impartially and that its decision is well-grounded in fact. Remaining true to our standard of review is not to blindly approve any and all custody decisions with the rap of a rubber stamp, especially when admitted facts emerge from a record that clearly show a change in circumstances affecting the best interest of the child. This is such a case, as the record reveals a pattern of reprehensible conduct on the part of the custodial parent designed, not just to drive a wedge between, but to eliminate the non-custodial parent from the child's life. I dissent because this court should not place its stamp of approval on the trial court's decision allowing the child to remain with the custodial parent.

In the previous appeal, we affirmed the trial court's decision changing custody of the child to appellee because appellant was found to have engaged in behavior deemed to alienate appellee from the child. This behavior included sending "tacky" emails, withholding medical information, the denial of visitation after the

child had a biopsy, lying about taking the child to the emergency room because of a dosage of Tylenol appellee had given, failing to follow a court order to let appellee babysit the child, not having the child ready for visitation, delaying visitation when the child was asleep, and informing appellee about the child's surgery late and by email. The trial court considered appellant's actions "horrific," "evil," and detrimental to the child. While we affirmed the change of custody, we reversed the requirement of supervised visitation because there was no evidence of mental instability to warrant supervision.

Let us now examine the record in the current case to see how appellee has acquitted himself as the custodial parent. At the moment custody was changed, appellee did not allow the child to keep any of his toys, not even his favorite one. He has refused to allow the child to bring home birthday and Christmas gifts given to the child by appellant and her family. He has also refused to allow the child to wear clothing given the child by appellant, and he has apparently imparted his no-gift policy to his mother, who supervised visitation for a while. She once removed a Razorback outfit the child had been given at visitation and, in her words, she "threw it on the car and left."

Just several months after custody was changed, appellee and his family falsely accused appellant of sexually abusing the child during a diaper change in full view of everyone in the room. Appellee's mother reported that appellant held the head of the child's penis, picked all around it, and wiped it off. She felt this was "unnatural." This incident was videotaped, and a review of the tape reveals that absolutely nothing untoward happened at all. Yet, appellee has persisted in his claim of sexual abuse, despite clear evidence to the contrary.

After this visit, appellee issued an ultimatum through his attorney that he would cease visitation unless appellant agreed in writing to not change the child's diaper. Appellee has made other demands in regards to visitation. The child has eczema, and appellee has seen to it that appellant may not use that word during visitation. Appellant's sister moved to Great Britain, and she showed the child where it was located on a globe during one visitation session and said they might visit there. The child came home and told appellee this, and appellee told the child "no," causing the child to "freak out," according to appellee. After that, appellant was forbidden to mention England during visitation. Appellant was also forbidden to correct the child when he referred

to her by her first name instead of "mommy." Appellant was also forbidden to correct the child when he referred to appellee's wife as "mommy." Those supervising visitation were to closely monitor appellant's communications with the child to make sure that she did not speak of these vile subjects. And, speaking of supervisors, appellee saw to it that one of them was fired after she chastised him for coming to the door instead of waiting at the car and also chastised him for berating appellant for "messing up" the child's hair.

Within days of the "diaper" incident, the child was scheduled for an important doctor's visit. Though it was a violation of a court order, appellee decided not to let appellant attend the visit. Appellant came anyway, and appellee had her escorted out of the hospital by security, while the child was screaming for his mother. As a result, appellant was required to sit in her car all day until appellee finally let her come back inside for the test results. At another doctor's appointment, the child was crying for his mother as appellee carried him back to the room. Although the child wanted his mother, appellee would not let her come into the room initially, and he only relented because the child would not stop crying. On another occasion, appellant wanted to carry the child to the car after the doctor visit, as she had allowed appellee to do when she had custody. Appellee told her to stop, and when she did not obey him, he forcibly removed the child from her arms.

Appellee has also denied visitation when it suited him. Appellee has canceled the child's doctor appointments so that appellant could not attend. He and his wife once went to the restaurant where appellant worked and, unsolicited, he spoke badly about her to a coworker, saying that she had lost custody and was under supervised visitation. Appellant drove by appellee's home on one occasion, and appellee got in his car and chased her. Appellee has adamantly refused to participate in family counseling and maintains that there is nothing wrong with him and that it would not benefit the child.

There is an ill wind blowing from different directions in this case. The record reveals a certain coziness between appellee and the child's attorney ad litem that is disturbing. The record is punctuated with objections made by the trial judge during appellant's counsel's examination of witnesses, with the court sustaining those objections when counsel had the temerity to express her point of view. In addition, the trial court, sua sponte, held appellant in contempt, a decision that even the majority finds fault

with. The record also shows that appellant had been entrusted with the custody of her sisters, one of whom had a baby. From those who observed appellant during that time, she was said to have handled the situation "beautifully." At the time of the hearing, appellant still had custody of the one sister with a baby. Yet, appellant is still considered unfit to either have custody or unsupervised visitation of her own child?

The trial court did make extensive findings outlining its decision. In those findings, the trial court declared there was no evidence that the child was being harmed by appellee's conduct. However, in the previous appeal we recognized that one parent's efforts to alienate the child from the other has a detrimental effect on the child. In the previous case, there was no direct evidence of harm presented. The conduct was considered harmful in and of itself because it is desirable and in a child's best interest to maintain a good relationship with the non-custodial parent. Here, appellee's misdeeds were admitted by him, which allows us to objectively view the evidence to determine whether there was a material change in circumstances affecting the best interest of the child. Keeping in mind that this litigation was begun by appellee filing a motion to further restrict appellant's already limited visitation, the record reveals a concerted effort on the part of appellee to alienate the child from appellant. And, when one compares his present behavior to her past conduct, one sees that his behavior is far more damaging to the child. Whereas appellant's conduct was directed at appellee personally, appellee's more egregious conduct took place *in the presence of the child*. At the end of the day, it is not the length and detail of a trial court's findings that matters when the record reveals them to be nothing more than empty words. Being faithful to our standard of review, I am convinced that the trial court's decision is clearly against the preponderance of the evidence. Therefore, I dissent. I am authorized to state that Judge Hart joins in this dissent.