Richard Franklin ANDERSON *v.* Robin Annette ANDERSON (Prault)

CA 93-65                                        863 S.W.2d 325

Court of Appeals of Arkansas
En Banc
Opinion delivered October 27, 1993

*Michael Knollmeyer*, for appellant.

*Richard Garnett*, for appellee.

MELVIN MAYFIELD, Judge. This is an appeal from the chancellor's order denying appellant's petition for a change in custody.

Appellant Richard Franklin Anderson and appellee Robin Annette Anderson (Prault) were divorced on March 14, 1991. Custody of the parties' minor child Tamara Anderson, born February 3, 1989, was awarded to the appellee. On May 27, 1992, the appellant filed a motion for change of custody alleging Tamara had been in the custody of Brenda Calva, her maternal grandmother, since May 1991 and that appellee is mentally and financially unstable. On September 30, 1992, the chancellor entered a decree which, among other things, continued custody with the appellee and ordered appellee and her present husband, Mr. Prault, to attend counseling.

Appellant first argues that the chancellor's decision is against the preponderance of the evidence and is clearly errone-ous. He says the choice was between awarding custody to a man who was an excellent father, and awarding custody to a woman who had lived a life that was unsuitable for the raising of children, and who would not be a suitable person to have custody if she continued to live as she had in the past.

At the hearing on appellant's motion for change of custody there was evidence that the parties' two sons, who were not

mentioned in the divorce but who live with the appellant, are happy and well adjusted; that the appellant's house is nice and clean; that he has a stable job; that Tamara loves him; and that he has no current drug or alcohol problems.

There was also evidence that the appellee had three children in addition to Tamara, that she maintained very little contact with her other children, had given up guardianship of Tamara, had twice attempted to commit suicide, could not hold a job, was promiscuous, had a somewhat violent nature, was emotionally unstable, and was married to a man who had assaulted his former wife and who had been awarded only supervised visitation with his own child.

But, Barbara Bunton, a licensed clinical social worker, testified she had done a home study of appellee and found the physical environment adequate and that she had no concerns about placing Tamara with the appellee and Mr. Prault. On cross-examination Ms. Bunton testified she was not aware that Mr. Prault was convicted of third degree battery in 1991, that he had attempted to commit suicide in the near past, or that appellee had also attempted to commit suicide. After reviewing some confidential court records, Ms. Bunton testified that both suicide gestures appeared to be "just that, gestures, reactive depression," — his following a divorce with his wife and frustration over visitation problems and hers after a "big blowout" with her mother — and that if the court were to order family counseling she would have no qualms about placing Tamara with them.

Moreover, the evidence showed that Brenda Calva, appellee's mother, obtained guardianship over Tamara because Mrs. Calva was concerned about obtaining medical care for Tamara. Appellee agreed to the guardianship, but it was part of their agreement that when appellee became able to take care of Tamara, Mrs. Calva would return her. Shortly before filing the motion for change in custody, the appellee filed a petition to set aside the guardianship, but the guardianship continued until the hearing on the motion to change custody.

Finally, we note that during the testimony the chancellor stated:

[S]he was granted custody of this child in March of 1991.

Nobody in her family, her husband at the time, her mother or her sister or anybody else came forward to tell this Court that this was a bad deal and that this child was in danger or at risk.

Now, the law says for me to — I've listened to so much today that my mind is beginning to kind of get boggled with it. I want to know how the circumstances have changed, and if so, how significant it is since March 14, 1991.

I have really been patient of listening to stuff back twelve and fourteen years ago and even seven and eight years ago. I want to know how things have changed since March 14, 1991, and I'm going to restrict everybody from that day forward to that.

A change in custody cannot be made without showing a change in circumstances from those existing at the time the original order was made as the original decree constitutes a final adjudication of the issue. *Carter v. Carter*, 19 Ark. App. 242, 719 S.W.2d 704 (1986). The primary consideration in awarding the custody of children is the welfare and best interests of the children involved; other considerations are secondary. *Scherm v. Scherm*, 12 Ark. App. 207, 671 S.W.2d 224 (1984). Moreover, in a child custody case, the chancellor's findings will not be reversed unless they are clearly against the preponderance of the evidence. *Ketron v. Ketron*, 15 Ark. App. 325, 692 S.W.2d 261 (1985). In *Calhoun v. Calhoun*, 3 Ark. App. 270, 625 S.W.2d 545 (1981), we said:

> In cases involving child custody a heavier burden is cast upon the chancellor to utilize to the fullest extent all of his powers of perception in evaluating the witnesses, their testimony and the child's best interest. This court has no such opportunity. We know of no case in which the superior position, ability and opportunity of the chancellor to observe the parties carry as great weight as one involving minor children.

3 Ark. App. at 273.

After careful consideration of the record in this case, we cannot say that the decision of the chancellor was clearly against a preponderance of the evidence or clearly erroneous.

Appellant also argues the chancellor erred in not basing his decision on the best interest of the child. He contends the court did not base its decision on the best interest of the child, but rather sought to give the appellee one last chance to be a mother. We do not agree.

At the conclusion of the hearing the trial judge stated "the hardest thing any judge can do, is to decide who is — what would be in the best interest of a child when more than one party wants custody of a child." He said he has "to do what's in the best interest of the child within the best of my ability." The chancellor stated that Tamara deserves to know her mother and he is going to give the appellee the chance to give Tamara the nurture and the love and upbringing Tamara deserves, needs, and is entitled to. The judge also noted that the appellant and appellee both have had "a bad, stormy past." He said the appellant had admitted to drug habits in the past, although he appears to be an excellent father now. The judge also said he was requiring the appellee and her present husband to seek counseling and he wanted a report from the counseling center every three months.

We cannot say the trial judge did not consider the child's best interest or that his decision in that regard was clearly erroneous.

Affirmed.

JENNINGS, C.J., PITTMAN and ROBBINS, JJ., dissent.

JOHN MAUZY PITTMAN, Judge, dissenting. I respectfully dissent. I have no disagreement with Judge Robbins' dissenting opinion. I write only to address factors pertaining to the best interest of the child.

The original decree is a final adjudication that one parent or the other was a proper person to have care and custody of the child and before that order can be changed there must be proof that conditions have so materially changed as to warrant modification *or* proof of material facts which were unknown to the court at the time. *Watts* v. *Watts*, 17 Ark. App. 253, 707 S.W.2d 777; *see Thigpen* v. *Carpenter*, 21 Ark. App. 194, 730 S.W.2d 510.

There would appear to be no disagreement on the part of the trial court or the members of this court that appellant met the above standard. *Watts* v. *Watts*, *supra.* Even so, any modification

of custody must also be in the best interest of the child. The court looks to a variety of factors to determine what is in the child's best interest: moral fitness of each parent; the age, gender, and health of the child; the attitude of each parent toward the child; the psychological relationship between the parents and the child; the physical and mental health of the parties; the child's need for stability and continuity in her relationship with parents and siblings; whether the child's social or family relationship would be disrupted by one parent having custody rather than the other parent; the relationship between the parents and the child as revealed by the parents' past conduct and by the strength and sincerity of the parents' desire to have custody; the reasonable preferences of a child the parents' affection and guidance and a continued religious education, if any. Clearly, these examples are not intended to be exhaustive, nor will each be applicable in every case. In custody litigation, some factors weigh more heavily than others; at times, only the aggregate influence will make the difference. While such factors do not mechanically decide cases, they do tell counsel and trial courts what to look for.

When the applicable criteria are applied to the specifics of this case, I believe that the chancellor's findings are clearly against the preponderance of the evidence and that custody of the child should have been placed with her father.

JENNINGS, C.J., and ROBBINS, J., join in this dissent.

JOHN B. ROBBINS, Judge, dissenting. I respectfully dissent from the prevailing opinion of this court because I believe that the evidence overwhelmingly proves that it is in the best interest of this minor child to be placed in her father's custody.

While I acknowledge that a chancellor's decision in child custody matters is entitled to considerable deference, there are occasions when we may, and should, reverse the trial court's decision. I submit that this is one of those occasions.

The object of this custody action is Tamara Anderson, a three- year-old child. The proof at trial portrayed the two competing parents in very sharp contrast. The father, Richard Anderson, has stable employment and resides in Alvin, Texas, where he has lived for thirty years. His three sons, Richard, age 13, Christopher, age 5, and Sean, age 4, have always lived with

him. Richard is his son from a prior marriage. Christopher and Sean were born of his marriage to appellee, Robin Prault. These children are doing well in a nearby school and attend church each weekend. Mr. Anderson's mother is available and helps him with his sons. He spends his time with his sons when he is not at work. Tamara has a very close relationship with these brothers. Ms. Prault stipulated at trial that Mr. Anderson is "doing a good job of raising the boys." The chancellor also found "I have absolutely no doubt that Mr. Anderson is an excellent father."

Ms. Prault's mother, Mrs. Calva, and her sister, Kim Randall, appeared at the hearing and testified for Mr. Anderson. Both testified about Ms. Prault's emotionally instability. Her mother testified that soon after the parties' divorce, Ms. Prault voluntarily placed Tamara with her and agreed to Mrs. Calva's appointment as guardian of Tamara's person. Until Ms. Prault married William Prault in November, 1991, she only visited Tamara infrequently, and then only for a few minutes at a time. She visited more often after her remarriage but only kept Tamara overnight on two occasions. She further stated that Ms. Prault frequently changed jobs, and since June 1990 she has had at least eight different jobs. She stated that Ms. Prault often throws "fits" without regard to who is present, sometimes in the presence of Tamara. She testified that Ms. Prault drinks frequently and causes scenes when she is drunk. She and her husband have fought in front of Tamara. Mrs. Calva refused to let Ms. Prault take Tamara in her car on one occasion because she had drunk too much to be driving. Ms. Prault had a son prior to her marriage to Mr. Anderson. This son is now ten years of age. She does not visit nor maintain communication with the child and seldom has contact with her two sons who are in Mr. Anderson's custody. Ms. Prault attempted suicide on February 4, 1992.

Mr. Prault's former wife, Dana Hathcoat, testified that she and Mr. Prault have a three-year-old daughter for whom Prault was ordered to pay support but does not. His visitation rights, though not exercised, are restricted to be supervised at his mother's home. When Ms. Hathcoat was eight and one-half months pregnant Mr. Prault put a rope around her neck, threatened her with a bottle opener, pulled hair from her head, and forced her to the ground, for which he was convicted of third degree battery. Mr. Prault also attempted suicide on July 28,

1990.

All of the foregoing proof was unrebutted because the hearing was concluded when the court granted Ms. Prault's motion for a directed verdict at the close of Mr. Anderson's case.

While announcing his ruling from the bench, the chancellor made these observations:

> I have some serious, serious reservations about putting this child back with you, Ms. Prault. You've had three other children, and you've either given up custody of them or — your efforts at trying to see them is not stellar.
>
> . . .
>
> If Ms. Prault and if Mr. Prault continue to live as they have lived in the past, then they're not suitable parents, would not be suitable at all to raise this child. You surely should recognize that. You cannot live recklessly in multiple relationships, not being able to work, emotional outburst, that sort of thing cannot be in the best interest of a child if a child is exposed to that.
>
> . . .
>
> Robin [Prault] has had a stormy life and a stormy past and I'm very, very reluctant to allow this child to go and be raised by her, but I'm going to grant custody to Robin, and I going to do it for several reasons.
>
> . . .
>
> She's got these other children that she has allowed to be taken off. Granted, one, she probably doesn't know where they are — or is, but she's going to find that out I'm sure. Two down in Texas that she's not made very many efforts to go see, and one of them is only five, only two years older than that little girl. Doesn't have a mama. And that's not very exemplary.
>
> But that doesn't mean that you cannot reestablish a relationship. It doesn't mean you're probably ever going to get custody, but it means that — it doesn't mean that you can't reestablish a relationship. And that little girl deserves to know her brothers and needs to know her brothers. Not

just two, not just three, but four. She's got four brothers. Two by you and Mr. Anderson, one by Mr. Anderson with this lady and one by you that lives down in Florida somewhere.

. . .

So, I'm going to give you an opportunity, one last opportunity, to become a mother and to give her the nurture and the love and the upbringing that she deserves and needs and is entitled to.

While the chancellor correctly articulated the issue before him, i.e., "what would be in the best interest of [the] child," the court's explanation of why custody was being placed with Ms. Prault would only have been applicable if Ms. Prault and a non-parent had been vying for custody. *Schuh* v. *Roberson* 302 Ark. 305, 788 S.W.2d 740 (1990). Ms. Prault's parental right to custody, or her fitness for custody, is not the issue. As pitiable as Ms. Prault may be, the focus must be on the child, without regard to Ms. Prault's welfare and some hope for her rehabilitation. The issue is, as stated by the chancellor, what is in the best interest of this child, i.e., as between Mr. Anderson and Ms. Prault, which of these two, with the sole consideration being the best interest of the child, should have custody. Based upon the evidence before the court, to conclude that it is in the child's best interest to be placed with Ms. Prault, rather than Mr. Anderson, is clearly against the preponderance of the evidence. I would reverse and remand to the trial court.

JENNINGS, C.J., and PITTMAN, J., join.