Mary Dawn May CARVER *v.* Paul Jared MAY

CA 02–685                                   101 S.W.3d 256

Court of Appeals of Arkansas
Division III
Opinion delivered March 19, 2003

*Bill Walters*, for appellant.

*Brenda Austin, Ltd.*, for appellee.

KAREN R. BAKER, Judge. Appellant, Mary Dawn May Carver, appeals from an order of the Sebastian County Circuit Court changing custody of the parties' minor children to appellee, Paul Jared May, the children's father. She argues on appeal that the trial court erred when it granted appellee's petition to modify custody and placed custody with appellee. She further asserts that there was no material change of circumstances from the decree filed December 8, 2000, granting her initial custody of the parties' two preschool-aged daughters, and that it was not in the best interests of the children to change custody. We affirm.

The parties were divorced in December 8, 2000. There were two children born of the marriage, H.M., born May 24, 1997, and A.M., born December 12, 1998. Appellant was awarded custody of the two minor children because she was the primary caretaker of the children, and as specifically stated in the divorce decree, because "the extreme animosity of [appellee] and his family toward [appellant] would be prohibitive to [appellant] having a continued relationship with the minor children should the Court award custody to [appellee]." In the decree, appellant was granted permission to move with the children to her home state of Washington. Appellee was granted standard visitation in Arkansas for Christmas and summer vacations. All other visitation was to be in Washington. Appellee was also ordered to pay child support of $68 a week and to provide appellant with her share of the 1999 income-tax refund of $1,574.

On December 12, 2000, less than one month after the divorce decree had been filed, appellee was refused his first visitation by appellant. Appellant testified that she was attempting at that point to postpone visitation until the attorneys and the court could be involved because the children were only allowed to go to Arkansas twice a year, and they had already been to Arkansas twice prior to the divorce. On May 15, 2001, appellee filed a motion for extension of summer visitation, requesting three full months of summer visitation. On May 30, 2001, appellee filed a petition to modify custody alleging that appellant would not agree to the three-month summer visitation and that appellant was interfering with phone visitation. Appellant responded with a letter agreeing to give appellee more summer visitation, but less than three months. On June 6, 2001, appellant filed a motion for contempt, alleging that appellee had failed to pay his child support, was in arrears, and that appellee had failed to provide her with the money from the income-tax return.

Appellee next attempted to exercise visitation in June 2001. He drove to Washington, where he was surrounded by police and drug agents as he stepped out of his hotel. The incident was the result of an anonymous tip generated by appellant, her mother, and a third person. The officers searched appellee and his vehicle. The search proved fruitless, and he was allowed to resume his visitation with his children. On June 27, 2001, appellee filed a motion for contempt alleging that appellant had caused him to be searched by drug officers for drugs upon his arrival in Washington for visitation. At the conclusion of the summer visitation, appellant arrived at appellee's home in Greenwood, Arkansas, with a sheriff's deputy who proceeded to search the children's luggage. The search revealed nothing. Shortly after their return to Washington, following appellee's summer visitation, appellant made allegations of sexual abuse of the children by appellee. The resulting investigation was closed as unsubstantiated and on November 13, 2001, appellee filed a motion alleging that appellant falsely accused him of molesting his children. Despite the results of the investigation, on December 11, 2001, appellant filed a petition and affidavit for a protective order in Washington based upon the same allegations of sexual abuse. In December 2001, appellee once again made the trip to Washington to exercise his Christmas visitation. When he arrived at the appellant's home, he was served with a protection order prohibiting him from contacting

the children and notice of a hearing in twelve days. Appellee remained in a hotel in Washington for the twelve days until the hearing. Following the hearing regarding the protection order, appellee was allowed four hours of visitation with the children, which was supervised by appellant at her home.

At the conclusion of the hearing in Arkansas on appellee's petition to modify custody, the trial court found that there had been a material change of circumstances and that it was now in the best interest of the children that custody be placed with the father. This appeal followed.

In child-custody cases, we review the evidence *de novo*, but we do not reverse the findings of the court unless it is shown that they are clearly contrary to the preponderance of the evidence. *Thompson v. Thompson*, 63 Ark. App. 89, 974 S.W.2d 494 (1998). We also give special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses in child-custody cases. *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999). We have often stated that we know of no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving children. *Watts v. Watts*, 17 Ark. App. 253, 707 S.W.2d 177 (1986). A finding is clearly against the preponderance of the evidence, when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Hollinger v. Hollinger*, 65 Ark. App. 110, 986 S.W.2d 105 (1999).

The principles governing the modification of custodial orders are well-settled and require no citation. The primary consideration is the best interest and welfare of the child. All other considerations are secondary. Custody awards are not made or changed to punish or reward or gratify the desires of either parent. Although the chancery court retains continuing power over the matter of child custody after the initial award, the original decree is a final adjudication of the proper person to have care and custody of the child. Before that order can be changed, there must be proof of material facts which were unknown to the court at that time, or proof that the conditions have so materially changed as to warrant modification and that the best interest of the child requires it. The burden of proving such a change is on the

party seeking the modification. *Word v. Remick*, 75 Ark. App. 390, 58 S.W.3d 422 (2001) (citing *Watts v. Watts, supra.*)

■ Appellee asserts that appellant has become so combative, uncooperative, and hostile concerning his parental rights that a substantial change in circumstances has occurred. Appellee contends that it was appellant's goal to make visitation so miserable and expensive that appellee would give up his parental rights. There is a two-step process through which a court must proceed in deciding a petition for change of custody. *Riley v. Riley*, 45 Ark. App. 165, 873 S.W.2d 564 (1994). First, the chancellor must determine whether there has been a significant change in the circumstances of the parties since the most recent custody decree. *Id.* If the trial judge finds that a significant change in circumstances has occurred, the court must then decide custody placement with the primary consideration being the best interest of the children. *Id.* (citing *Anderson v. Anderson*, 43 Ark. App. 194, 197, 863 S.W.2d 325, 327 (1993)). In the present case, the trial judge stated in his opinion that previously "in making its visitation order that it was going to be very difficult for [appellee] to maintain a relationship with his children and that the full cooperation of [appellant] was going to be absolutely necessary."

■ In *Hepp v. Hepp*, 61 Ark. App. 240, 968 S.W.2d 62 (1998), we held that violation of the court's previous directives does not compel a change in custody. The fact that a party seeking to retain custody of a child has violated court orders is a factor to be taken into consideration, but it is not so conclusive as to require the court to act contrary to the best interest of the child. *Johnson v. Arledge*, 258 Ark. 608, 527 S.W.2d 917 (1975); *Kerby v. Kerby*, 31 Ark. App. 260, 792 S.W.2d 364 (1990). To hold otherwise would permit the desire to punish a parent to override the paramount consideration in all custody cases, i.e., the welfare of the child involved. *Id.* Moreover, to ensure compliance with its orders, a trial judge has at his or her disposal the power of contempt. And, we have said that a court's contempt powers should be used prior to the more drastic measure of changing custody, *Carter v. Carter*, 19 Ark. App. 242, 719 S.W.2d 704 (1986), which is keeping with the principle that custody is not to be changed merely to punish or reward a parent. *Harvell v. Harvell*, 36 Ark.

App. 24, 820 S.W.2d 463 (1991). In addition, we have held that whether one parent is alienating a child from the other is also an important factor to be considered in change-of-custody cases because a caring relationship with both parents is essential to a healthy upbringing. *Turner v. Benson*, 59 Ark. App. 108, 953 S.W.2d 596 (1997).

In this case, appellant's actions alienated the children from their father by interfering with visitation to such a degree as to affect the well-being of the children. Not only did appellant repeatedly interfere with appellee's visitation, beginning less than one month after the divorce decree was filed, she instigated a sexual-abuse investigation when the children returned to Washington after their summer visitation with their father. The investigation was based on appellant's observations that the children had begun exhibiting behavioral changes when they returned from visiting appellee that summer. Testimony from Ken Hunt, an investigator with the Arkansas State Police Crimes Against Children Division, showed that the hotline received a tip in July 2001 that prompted the investigation. The two children were subjected to sexual-assault examinations at the Providence St. Peter Hospital; however, the medical examination report stated that the examinations were normal with respect to both children. Laila Thompson, a child and family therapist with the Cascade Mental Health Care, testified in her deposition that she saw H.M. on July 10, 2001, because appellant believed the child was experiencing a change behaviorally after returning from visitation with her father, such as not sleeping at night, nightmares, refusing to go to sleep alone, and talking about doing things to her sister that she had never done before. During observation, Ms. Thompson testified that H.M. told her that "daddy touched me and my sister," and that H.M. pointed to her genital area. In Rebecca Tetizel's deposition testimony, she stated that she was an educational assistant for the Centralia School District. While A.M. was at school one day after returning from seeing her father, she showed signs of a behavioral change, such as shaking and crying when her diaper was being changed. Nonetheless, based on the medical report and other factors including the interviews he conducted during the investigation, Mr. Hunt "closed [the] investigation as 'Unsubstantiated.'"

It was not until the following December, when appellee drove to Washington to begin Christmas visitation, that he was met with a protective order at appellant's home prohibiting him from having any contact with the children, premised on the behavioral changes exhibited in July. After waiting in a hotel for twelve days for the hearing, he was given four hours of supervised visitation in appellant's home. It is clear that appellant was intentionally thwarting any opportunity for appellee to visit his children and attempting to alienate them from their father. Former spouses are often hostile to one another, and it is unfortunate when their children are forced to bear the consequences. We agree with the trial judge that allowing appellant to retain custody of the children and returning with them to the state of Washington would be tantamount to terminating appellee's parental rights. Intentional alienation and interference with visitation to such a degree as to affect the well-being of the children cannot be tolerated.

In cases involving child custody, a heavier burden is cast upon the court to utilize to the fullest extent all its powers of perception in evaluating the witnesses, their testimony, and the child's best interests. *Arkansas Dep't of Human Serv. v. Couch*, 38 Ark. App. 165, 832 S.W.2d 265 (1992). The appellate court has no such opportunity, and it has often been said that we know of no case in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as when the interests of minor children are involved. *Id.* Here, appellant intentionally interfered with visitation to an extreme, even though there was no evidence to support appellant's drug-abuse allegations, and the sexual-abuse allegations were unsubstantiated. Moreover, during the investigation, the children were subjected to medical sexual-assault examinations and were denied visitation with their father even after the investigation concluded the allegations were unsubstantiated. Such actions can hardly be said to be in the best interest of the child. Appellant's interference with visitation was so extreme that the best interest of the children required that they be removed from the situation. Under these circumstances, we hold that the trial court's findings were not clearly erroneous; thus, we affirm the chancellor's decision to modify custody in this case. *See Turner v. Benson, supra* (affirming chancellor's decision to change custody where evidence

showed that mother was alienating the thirteen-year-old child from his father by interfering with father's visitation schedule, and making derogatory statements about the father in the presence of their thirteen-year-old son, despite evidence that the son had a good relationship with the father and expressed a desire to live with mother).

Affirmed.

CRABTREE and ROAF, JJ., agree.