

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-13-543

GINNY SKAGGS ELLIOTT
APPELLANT

V.

DANNY SKAGGS and MINOR CHILD
APPELLEES

Opinion Delivered December 4, 2013

APPEAL FROM THE CRAWFORD
COUNTY CIRCUIT COURT,
[NO. 17DR-08-73]

HONORABLE GARY COTTRELL,
JUDGE

AFFIRMED

## WAYMOND M. BROWN, Judge

Appellant Ginny Elliott appeals from an order of the Crawford County Circuit Court changing custody of the parties' minor daughter to appellee, Danny Skaggs. She argues on appeal that the trial court erred by granting Danny primary custody of V.E. Ginny contends that there was no material change in circumstances sufficient to modify the court's previous custody order. We find no error and affirm.

The parties were divorced by decree entered on May 30, 2012. Only one child was born of the marriage, V.E., born February 12, 2008. Ginny was awarded custody of V.E., and Danny was granted standard visitation. The divorce decree stated that visitation between Danny and V.E. "shall not be obstructed, altered or denied unless authorized by this Court." The court also found that Ginny had "made efforts to exclude [Danny] from a relationship with the minor child from the time the child was born until the date of this hearing." The

decree addressed three separate reports made to the Arkansas Department of Human Services (DHS) alleging sexual assault of the child by Danny, and the court described them as "understanding and proper,"" willful," and "preposterous," respectively.

On September 5, 2012, Danny filed a petition for contempt and to modify custody. He alleged that a material change in circumstances had occurred since the entry of the divorce decree in that Ginny had made allegations of inappropriate behavior against either Danny or his adult daughter concerning the child. He also alleged that Ginny had taken steps to limit his visitation, including taking the child to the doctor and getting a letter stating that it was in the child's best interest to stay at home for the next seventy-two hours. According to Danny, Ginny's behavior was causing severe and permanent damage to the child. He asked that custody be transferred to him, that Ginny be ordered to pay child support, and that she be found in contempt for her behavior.

On September 20, 2012, Danny filed a motion for emergency ex parte custody, alleging that Ginny had completely eliminated his visitation with the child as of August 26, 2012. He also alleged that he had recently received information that Ginny had left the state and gone to Colorado with the child. In the motion, Danny also stated that he was contacted by Dana Dusha, an investigator for the Arkansas State Police Crimes Against Children Division (CACD), and was informed that the recent allegations against him would be found untrue and the case would be closed. Ginny filed a response to Danny's motion for emergency ex parte custody on October 5, 2012, denying the material allegations of the motion. She asked that the court reinstate supervised visitation between Danny and the child.

In the response, she also acknowledged that she had taken the child with her to Colorado to see Ginny's ill stepmother. Ginny filed a response to Danny's petition for contempt and modification of custody on October 15, 2012. In the response, she denied the material allegations of the petition, but she asserted that "the minor child continues to articulate statements consistent with improper conduct on the part of [Danny] and/or other individuals who have come in contact with the minor child while in the custody of [Danny]."

A scheduling conference took place on October 23, 2012. The court entered an order on November 19, 2012, continuing Danny's standard visitation schedule, but ordering that it be exercised in the presence of either his daughter or sister. The court set a January 31, 2013, bench trial for the matter, and appointed an attorney ad litem for the child. Ginny filed a motion to modify on October 20, 2012, alleging that a material change in circumstances had occurred and urging that visitation between V.E. and Danny "occur only under the supervision of appropriate individuals consistent with the intent of keeping the minor child free from harm." The motion also stated that the "minor child continues to assert significant inappropriate conduct on the part of [Danny] and such conduct is not in keeping with the best interests of the minor child." Danny replied to Ginny's motion on December 3, 2012, denying the material allegations of the motion.

On January 7, 2013, Ginny filed a motion for a forensic examination and for continuance of the scheduled trial date. Ginny stated that the forensic examination would assist and aid the court in its determination of the allegations of abuse. She also indicated that the attorney ad litem agreed that the forensic examination may be helpful. Ginny included

SLIP OPINION

the curriculum vitae of Jamie G. Vogt in her motion. Danny filed a motion for emergency relief on January 8, 2013, alleging that Ginny had once again eliminated his visitation with the minor child. He also claimed that Ginny had subjected the child "to physical and psychological examinations in an effort to produce testimony and/or evidence against [him]." Additionally, he alleged that since the scheduling order, he and/or his family "have been exonerated in two additional [CACD] investigations. There have been at least five separate investigations, with at least three different investigators, all of which have been unsubstantiated." Danny stated that this pattern of behavior would result in substantial damage to both him and the minor child. He asked that Ginny be held in contempt and that custody be transferred to him. Ginny filed a response on January 9, 2013, denying the material allegations in Danny's motion. However, she admitted that supervised visitation had not taken place as ordered because the child continued to express "inappropriate and unlawful behavior on the part of [Danny]."

Danny filed a response to Ginny's motion for a forensic examination and continuance on January 9, 2013. He denied the material allegations of the motion and asked the court to deny Ginny's request. He stated that Ginny had "continuously and systematically taken every opportunity available to her to deny [him] a relationship with his own child." He further stated that Ginny's "behavior is irrational, arrogant, and is not aimed at the best interest of this helpless child." He opined that Ginny's actions had "caused irreparable and undeniable damages which [he] and the minor child will be dealing with for the rest of their lives." Ginny filed a response on January 10, 2013, asserting that an independent forensic

SLIP OPINION

examination was helpful to the case and agreeing to initially pay the $3500 for the exam. The court denied the motion for a forensic examination and continuance in an order filed on January 22, 2013.

The bench trial took place as scheduled on January 31, 2013. Investigators Dana Dusha, Sam Dorrough, and Tara Flute of CACD all testified that there had been three separate reports of abuse and investigations concerning Danny and the minor child since May 2012.[1] All three of the reports were unsubstantiated or unfounded by the investigators, and subsequently closed after the necessary parties had been interviewed. According to the investigators, at the conclusion of their investigations none of them felt that Danny was sexually abusing V.E. However, they agreed that in as many as ninety-percent of sexual abuse cases, there is no physical evidence of the abuse.

Danny testified that visitation between him and V.E. initially went well after the divorce. He stated that the child never acted out sexually or inappropriately while at his house. He said that although he was granted unsupervised visitation with V.E., he decided to have someone else present for his own protection against the allegations previously made by Ginny, and because he wanted the child to be exposed to their family unit. He testified that he was contacted by the Van Buren Police Department on August 15, 2012, and informed that Wednesday night visitation would not take place as scheduled because the child was at the Hamilton House. Danny said that he was unable to exercise his weekend visitation

---

[1]Referrals concerning inappropriate behavior and/or sexual abuse were made August 14, 2012, October 2, 2012, and October 27, 2012.

because on August 17, 2012, Ginny gave him a letter indicating that the child was sick and needed to stay home several days. He stated that when V.E. came over on August 22, 2012, for visitation, she was wearing a whistle around her neck. Subsequent visitations were eliminated by Ginny until after the scheduling order in October.

Danny denied ever being alone with V.E., except for taking her to the restroom, between October 2012 and January 2013. He also denied having sexual contact with V.E., Danielle, or Jeremy.[2] Danny described the allegations against him and other members of his family as "bizarre" and "crazy." Danny testified that Ginny terminated visitation again, shortly after the scheduling order. He stated that it seems like it does not matter what the court says. According to Danny, V.E. never wants to go back home to Ginny and when it gets close to time to go, she "starts sullying up." He said that the child just has a blank look on her face at the conclusion of their visitations. Danny stated that he believed that the allegations of abuse had been conditioned in V.E.'s mind, and have been instilled as "false memories." He denied ever threatening to harm Ginny, H.E., or Shirley.[3] Danny testified that, excluding his sister, Janet Maddox, there had been allegations made against every member of his family.

Danielle testified that she was a LPN. She said that Danny raised her from the time she was twelve and that she never had any problems with him doing anything sexually or physically inappropriate to her. She stated that she had never seen her father act

---

[2]Danielle Parks is Danny's adult daughter who is married to Jeremy Parks.

[3]H.E. is Ginny's son and V.E.'s older brother. Shirley is Ginny's mother.

inappropriately with V.E. during the visitations. Danielle said that during the supervised visitations, she never left V.E. alone with Danny, Jeremy, or her daughter, A.P. She stated that V.E. had never said or disclosed anything sexual in nature in her presence. She testified that V.E.'s behavior changed when it was time for her to go home and that she got real quiet.

Janet testified that she had been present at about three or four of the supervised visitations. She stated that her home is in Oklahoma and that it takes her about an hour and forty-five minutes to reach Danny's home. She said that she had never seen any inappropriate interactions between Danny and V.E. She also stated that she had never seen inappropriate interactions between Danny and A.P., or any child. Janet testified that she was familiar with all of the allegations that had been made against Danny, Danielle, and Jeremy, and that she thought they were all outrageous.

Cathy Gifford testified that Ginny was dating her ex-son-in-law, Jimmy. She stated that she sells insurance for Farm Bureau and that Jimmy was involved in an accident. According to Cathy, Jimmy, Ginny, and V.E. came over to her house one evening for her to explain an insurance letter to Jimmy. She stated that at some point, she was left alone with V.E., and decided to ask V.E. if she enjoyed going to her father's house. Cathy said that V.E. disclosed to her that Danny licks her bottom and sticks his finger in her bottom. Cathy stated that V.E. also told her that Jeremy sometimes licks her bottom, too. Upon hearing this information, Cathy said that she got up and left the room and placed a call to the State Police Child Abuse Hotline. She admitted that she had initially gotten information concerning the alleged abuse from Jimmy and Rhonda Bell.

7

SLIP OPINION

Diana Elkins testified that she was the Director of First Place Academy, where V.E. attends preschool. She stated that on December 19, 2012, it was V.E.'s turn to go with her to ring the bell. She said that the two walked around the facility "talking about friends and trust and things like that." She stated that V.E. indicated to her that she had a secret. According to Diana, V.E. never disclosed this secret but V.E. formed what appeared to be a gun with her hand and indicated that she could not tell the secret because "her daddy said he would shoot Ginny . . . , and [H.E.], if she told the secret." Diana stated that V.E.'s whole demeanor changed. She said that she immediately called DHS, because she is a mandated reporter. However, she stated that she was told that there was nothing they could do. Diana conceded that she knew about the various sexual-abuse allegations prior to December 19, 2012.

Ginny testified that visitation proceeded as directed for a period of time after the divorce. She stated that she began to have concerns about V.E.'s safety between late June and early July. Ginny said that in August, V.E. began coming from visitation disclosing things to her. She also stated that V.E. had said something to H.E. about "playing dirty doctor." According to Ginny, these disclosures usually came at bath time or while Ginny was blow drying V.E.'s hair. The disclosures included acts of oral sex between V.E. and Danny. Ginny stated that she asked a teacher at school to talk to V.E. while they were preparing their rooms for the next school year. Based upon that conversation, a report was made to CACD. Ginny stated that subsequent to the report, she took V.E. with her to Colorado so that she could tend to her ill stepmother. She stated that they stayed in Colorado for about two-and-a-half

weeks and that V.E. continued to make disclosures during this time. Ginny testified that the next reporting event happened as a result of statements V.E. made to Cathy. Ginny stated that the third reporting event happened after she went and talked to someone. According to Ginny, she followed the visitation schedule after the scheduling order until she had a conversation with Diana in late December. She testified that visitation was terminated because she was fearful for her and V.E.'s lives. Ginny denied sexually abusing V.E., witnessing V.E. being abused, or telling V.E. or anyone else that V.E. had been abused. She stated that she only wanted V.E. to be safe and that she did not feel V.E. was safe in Danny's company.

Ginny admitted that part of her reason for going to Colorado was to try to keep V.E. safe. She stated that she did not tell Danny or Investigator Dusha about her plans to go to Colorado. Ginny testified that she had no communication with Danny between the time she went to Colorado until the scheduling hearing in October. She testified that she subsequently requested a leave of absence from work. Ginny stated that she questioned V.E. after each visitation with Danny. She acknowledged that V.E. had been the subject of at least six investigations and that V.E. had undergone numerous examinations. Ginny continued, "She [V.E.] has been forced to sit in a room with a forensic interviewer and discuss things that would make a pervert embarrassed. She has done it over and over." She stated that she made a unilateral decision to stop visitation in August because she felt it was best for V.E. Ginny agreed that visitation did not resume until the scheduling order in October. She stated that

although V.E.'s disclosure at school in December was not a physical threat, she decided that visitation would no longer continue.

Ginny testified that V.E. was doing better but that she was "still an emotional mess." She stated that when V.E. returned from visiting Danny the last time in December, she was in an altered state and that she "was absolutely exhausted and disassociated." Ginny also stated that when she gave V.E. a bath, the inside of V.E.'s vagina was "as red as an apple." She said that she called her sister-in-law, an LPN, who stated that she had never seen anything that red. Ginny denied doing anything to "incite [the court's] fury" and stated that she only tried to "look after the best interest of [her] child."

Jackie Hamilton, of Hamilton House, stated that the State Police usually defer to the interviewers at Hamilton House to conduct the interviews concerning sexual assault. She acknowledged that there had been three reporting events concerning V.E. since March 2012. Jackie stated that she did not conduct or observe all the interviews with V.E. She said that V.E. needed counseling because there was a reason V.E. continued to report. Jackie testified that she did not doubt that something had happened to V.E. She continued that

> [s]he has either seen it, heard it, been told it or experienced it. At her age, she could not have the vocabulary. At age four, it would be difficult for her to maintain something that someone had told her. It would be difficult for her to do, what I call, maintaining a lie. She is a very smart girl but children just tend to not have the capacity. They are horrific things that she has reported. And whether or not it happened, or she saw it happen, or was told it happened, it is still horrific and traumatic for her. . . .What she has done in my experience, is consistent with what I have seen with other youngsters who have been sexually abused.

Jackie stated that she had no first-hand knowledge of what happened in V.E.'s interviews, but that she had read the summaries. She opined that a psychological evaluation

10

would be helpful in this case. She testified that children V.E.'s age generally know two things, who and what. She stated that they get confused with time schedules. Jackie said that it would be hard for a child V.E.'s age to maintain a lie, even in a single interview. She testified that she could not say with certainty that Danny sexually abused V.E. or that Ginny coached V.E. in any way.

At the conclusion of the trial, Danny asked that the court grant his request to hold Ginny in contempt, and to grant him custody of V.E. Ginny asked that she be able to maintain custody. The attorney ad litem, on the other hand, asked the court to deny Danny's request for custody, to remove custody from Ginny, and to place the child in DHS custody. The court found Ginny in contempt and sentenced her to jail for the weekend. The court also found that there had been a material change in circumstances significant enough to warrant a change in custody. The court filed an order on March 1, 2013, granting Danny's petition. The order stated in pertinent part:

> 2. The Court hereby finds that the Defendant has willfully disobeyed the Orders of this Court and the Court hereby sentences the Defendant to serve jail time beginning 9:00 a.m. Friday, February 1, 2013, until Sunday, February 3, 2013, at 9:00 p.m.
>
> 3. The Court finds that the investigators for the Arkansas State Police, the Plaintiff, and the Plaintiff's daughter were all credible. The Court finds that the Defendant was credible in that the Court believes that she believed these disclosures were made. The Court finds that Ms. Elkins'[s] and Ms. Gifford's testimony were well intending but that the discussions with the minor child were colored by their previous discussions with the Defendant. The Defendant has precipitated the investigations into the Plaintiff by leading the minor child to be questioned by a mandated reporter. The Defendant has indicated that she has not and will not obey the orders of this Court. The Court hereby finds that there has been a material change in circumstance and that custody of the parties' minor child, [V.E.], is hereby changed to the Plaintiff.

SLIP OPINION

4. The Defendant is awarded standard visitation with the minor child with such visitation to begin the Wednesday night after she is released from jail, with her first weekend visitation being Friday, February 8, 2013, at 5:00 p.m. until Sunday, February 11, 2013, at 5:00 p.m. All other visitation shall be pursuant to this Court's Standard Order Regarding Child Visitation and Related Matters. This Court's Standard Order Regarding Children's Medical and Dental Expenses is attached hereto and is incorporated as if set forth word for word herein.

Ginny was also ordered to pay child support. She filed a timely notice of appeal. This appeal followed.

In child-custody cases, we review the evidence de novo, but we do not reverse the findings of the court unless it is shown that they are clearly contrary to the preponderance of the evidence.[4] We also give special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses in child-custody cases.[5] We have often stated that we know of no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving children.[6] A finding is clearly against the preponderance of the evidence, when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made.[7]

---

[4]*Carver v. May*, 81 Ark. App. 292, 101 S.W.3d 256 (2003).

[5]*Id.*

[6]*Id.*

[7]*Id.*

SLIP OPINION

The primary consideration in child-custody cases is the best interest and welfare of the child; all other considerations are secondary.[8] Custody awards are not made or changed to punish or reward or gratify the desires of either parent.[9] Before a custody order can be changed, there must be proof of material facts that were unknown to the court at that time, or proof that the conditions have so materially changed as to warrant modification and that the best interest of the child requires it.[10] The burden of proving such a change is on the party seeking the modification.[11]

Ginny argues that the trial court erred by finding a material change in circumstances and changing custody of V.E. to Danny. She also contends that the trial court did not consider the best interest of V.E. but granted Danny's petition to punish her for not following court orders. Ginny concedes that she disobeyed court orders, but contends that she was trying to further the best interest of V.E. She states that because she has only been held in contempt this one time, the trial court should not have changed custody of V.E. to Danny. There is a two-step process through which a court must proceed in deciding a petition for change of custody.[12] First, the court must determine whether there has been a significant

---

[8]*Id.*

[9]*Id.*

[10]*Id.*

[11]*Id.*

[12]*Riley v. Riley*, 45 Ark. App. 165, 873 S.W.2d 564 (1994).

change in the circumstances of the parties since the most recent custody decree.[13] If the trial judge finds that a significant change in circumstances has occurred, the court must then decide custody placement with the primary consideration being the best interest of the child.[14] In the present case, the trial court found that Ginny had indicated that she will not obey court orders and that she had precipitated investigations into Danny by directing V.E. to be questioned by mandated reporters. The court found this behavior to be enough to justify a change of custody.

In *Hepp v. Hepp*,[15] we held that violation of the court's previous directives does not compel a change in custody. The fact that a party seeking to retain custody of a child has violated court orders is a factor to be taken into consideration, but it is not so conclusive as to require the court to act contrary to the best interest of the child.[16] To hold otherwise would permit the desire to punish a parent to override the paramount consideration in all custody cases, *i.e.*, the welfare of the child involved.[17] Moreover, to ensure compliance with its orders, a trial judge has at his or her disposal the power of contempt.[18] And, we have said that a court's contempt powers should be used prior to the more drastic measure of changing

---

[13]*Id.*

[14]*Id.*

[15]61 Ark. App. 240, 968 S.W.2d 62 (1998).

[16]*Johnson v. Arledge*, 258 Ark. 608, 527 S.W.2d 917 (1975); *Kerby v. Kerby*, 31 Ark. App. 260, 792 S.W.2d 364 (1990).

[17]*Id.*

[18]*Carver, supra.*

SLIP OPINION

SLIP OPINION

custody,[19] which is keeping with the principle that custody is not to be changed merely to punish or reward a parent.[20]  In addition, we have held that whether one parent is alienating a child from the other is also an important factor to be considered in change of custody cases because a caring relationship with both parents is essential to a healthy upbringing.[21]

Here, Ginny admitted to unilaterally terminating visitation between Danny and V.E., although she had been court ordered not to do so in the divorce decree.  This had the effect of alienating V.E. from Danny.  Additionally, Ginny caused several unsubstantiated reports of sexual abuse to be filed against Danny and his family members over the course of just a few months.  As a result of these reports, V.E. had to go through numerous investigations and examinations.  Based on the evidence, we cannot say that it was clearly against the preponderance of the evidence for the trial court to find a material change of circumstances significant enough to warrant a change custody.[22]  Accordingly, we affirm.

In her reply brief, Ginny argues that it was error for the trial court to deny her motion for a more detailed forensic examination for V.E.  However, we do not address arguments made for the first time in a reply brief.[23]

---

[19]*Carter v. Carter*, 19 Ark. App. 242, 719 S.W.2d 704 (1986).

[20]*Harvell v. Harvell*, 36 Ark. App. 24, 820 S.W.2d 463 (1991).

[21]*Turner v. Benson*, 59 Ark. App. 108, 953 S.W.2d 596 (1997).

[22]*See Brewer v. Smith*, 2010 Ark. App. 134, 374 S.W.3d 87 (affirming a change in custody based on the appellant's repeated failure to follow visitation orders and repeated, unfounded allegations of abuse).

[23]*Stautzenberger v. Stautzenberger*, 2013 Ark. 148, ___ S.W.3d ___.



Affirmed.

WHITEAKER and VAUGHT, JJ., agree.

*Bequette & Billingsley, P.A.*, by: *Keith I. Billingsley*, for appellant.

*Walters, Gaston, Alison & Parker*, by: *Troy Gaston*, for appellee.