KENNETH S. HIXSON, Judge
This is a child-custody case. Appellant Jason Reynolds and appellee Stacy Reynolds (now Thomas) were married in March 2006 and divorced in September 2009. One son, C.R., was born of the marriage in July 2007. At the time of the divorce, the parties entered into an agreement, which was incorporated into the divorce decree, whereby the parties agreed that Stacy would be the "primary residential custodian" of C.R. subject to Jason's visitation.[1] The divorce decree ordered Jason to pay $ 72 in weekly child support. Both parties remarried in 2010, and both remained in Hot Springs, where they had lived during *442 their marriage. In July 2012, the parties entered into a "Final Order," approved by the trial court, whereby Stacy remained the primary residential custodian subject to Jason's visitation. The "Final Order" increased Jason's child support to $ 201 biweekly and altered some of the conditions of the prior agreement.
On February 24, 2016, Stacy filed a petition to relocate, to increase child support, and for contempt. In her petition, Stacy stated that her husband, Andy Thomas, was in law enforcement and had procured employment in McKinney, Texas, earning forty-eight percent more than he was currently making. Stacy requested that she be allowed to relocate with the child to Texas, where C.R. would have a better quality of life. Stacy also asked that child support be increased and that Jason be held in contempt for refusing to pay his share of medical expenses or extraordinary expenses.
On March 16, 2016, Jason filed a response to Stacy's petition, asking that all of her requested relief be denied. Jason also filed a petition for a temporary and permanent change in custody. In his custody petition, Jason alleged that there had been a material change in circumstances because Stacy had repeatedly withheld visitation, willfully created conflict in an attempt to disrupt the parties' custody arrangement, and alienated C.R. from Jason and Jason's family. Asserting that Stacy had neglected C.R.'s physical, mental, and spiritual well-being, Jason asserted that it was in the child's best interest for Jason to be awarded primary custody. Jason subsequently filed petitions for contempt based on Stacy's alleged prevention of his visitation with C.R.
Stacy's spouse began working in McKinney, Texas, in March 2016. However, Stacy and C.R. did not move to Texas until June 2016 after the end of the school year. Jason exercised his regular visitation with C.R. through June 2016 and then exercised his regular summer visitation. C.R. began third grade in Texas in August 2016.
A temporary hearing was held on September 6, 2016. On October 6, 2016, the trial court entered an order finding that there was insufficient time to conclude the temporary hearing, and that the parties had agreed to keep the record open and continue the proceedings at a final hearing to resolve all pending issues. Pending the final hearing, the trial court ordered that Stacy retain custody and that C.R. continue attending school in Texas. The final hearing was held on January 19-20, 2017.
On March 20, 2017, the trial court entered an "Order after Hearing," making these specific findings:
1. The Plaintiff [Stacy] is the primary custodian and there is not joint custody.
2. The Plaintiff's reasons for relocation include the substantial pay increase for her husband's employment and her assessment that educational opportunities were as good, if not better, at their projected school district in Texas as existed in Hot Springs.
3. The proposed relocation was not motivated by an intent to restrict the Defendant's [Jason's] visitation with the child.
4. The Defendant failed to rebut the presumption in favor of relocation.
5. The Defendant has not shown a change of material circumstances.
6. The Court does not find this to be a parental alienation case.
7. The Defendant's Petition for Change of Custody should be denied and the Plaintiff's Petition to Relocate should be granted subject to the visitation *443 to the Defendant as set out herein.
8. The Plaintiff is found to be in contempt for failing to allow certain specific periods of visitation which had previously been ordered.
The trial court found that Stacy would continue to have primary custody subject to Jason's visitation that included one weekend per month during the school year. Due to Jason's diminished weekend visitation, the trial court awarded Jason an unequal share of summer visitation.
Jason filed a timely notice of appeal from the March 20, 2017 order on April 18, 2017. Stacy filed motions to amend the order on June 15 and 22, 2017. On August 17, 2017, the trial court entered an "Amended Order after Hearing," which contained the same pertinent findings as the original order but slightly altered the visitation arrangement, ordered Jason to pay medical premiums, and contained a provision directing any employer to deduct money from Jason's pay in the event of child-support arrearages.
In this appeal, Jason raises three arguments. His primary argument is that the trial court erred in denying his petition for a permanent change of custody of the child. Jason also argues that the trial court erred in refusing to consider and allow him to introduce extrinsic evidence of inconsistent statements made by Stacy's sister-in-law, Gina Thomas. Finally, Jason contends that the trial court erred in granting Stacy's motion to amend the March 20, 2017 final order. We affirm.
Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the child; all other considerations are secondary. Anderson v. Thomas , 2013 Ark. App. 653, 2013 WL 5964473. Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. Grisham v. Grisham , 2009 Ark. App. 260, 2009 WL 936952. The reasons for requiring more stringent standards for modifications than for initial custody determinations is to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues. Id.
The party seeking modification of the custody order has the burden of showing a material change in circumstances. Alphin v. Alphin , 364 Ark. 332, 219 S.W.3d 160 (2005). In order to change custody, the trial court must first determine that a material change in circumstances has occurred since the last order of custody; if that threshold requirement is met, it must then determine who should have custody with the sole consideration being the best interest of the child. Tipton v. Aaron , 87 Ark. App. 1, 185 S.W.3d 142 (2004). The trial court's findings on whether a material change in circumstances warrants a change in child custody will not be reversed on appeal unless they are clearly erroneous. Shannon v. McJunkins , 2010 Ark. App. 440, 376 S.W.3d 489.
Stacy testified that her husband works in law enforcement and that she has been a stay-at-home mom since 2012. Stacy stated that her husband received a substantial pay increase when he began working for the McKinney, Texas, police department. Stacy testified that they live in a nice house in Texas near C.R.'s school. She stated that C.R.'s school in Texas affords him more opportunities than he had in Arkansas and that there are more extracurricular activities available there.
Stacy testified that her husband has "taken C.R. in as his own" and that even though that has caused a little bit of friction between her husband and Jason, "C.R. has thrived with my husband being a part of his life." Stacy also stated that *444 they have extended family in Texas, which provides a great support system.
Stacy thought it important that C.R. have visitation with his father. She testified that, although there had been "bumps in the road," she and Jason have a workable relationship, and that they could work around any issues they have.
Jason testified that he lives in a nice house in Hot Springs with his wife, Nicole, and that they have two children together who are C.R.'s younger half-siblings. Jason testified that he had been unemployed for the past couple of months but that he was receiving unemployment compensation and was applying for jobs in the management field, which has been his area of work for the past fifteen years. Jason's wife is a full-time registered nurse, who also works as a college instructor. Jason stated that C.R. has a good relationship with him and his wife and that C.R. is very close with his siblings. C.R. also has a close relationship with their extended family, including Jason's parents and Nicole's parents. Jason stated that they engaged in regular family activities including church but that these have been restricted since C.R.'s move to Texas. Jason stated that the opportunities available to C.R. in Hot Springs are comparable to those in McKinney, Texas.
Jason described his relationship with Stacy as difficult and relatively hostile. He stated that most of their communication is through texting or emails so his words cannot be twisted or misunderstood.[2] Jason indicated that Stacy was not proactive in keeping him informed about what is going on in C.R.'s life, and that when he contacted Stacy she would give delayed responses. He stated that the tones of Stacy's emails were hostile. He thought that over the years their communications had degraded and decreased. Jason also testified that their communications about visitation and how it should be exercised were often hostile, and that on some occasions Stacy had denied his scheduled visitation with C.R. Jason also described instances when, in C.R.'s presence, both Stacy and her husband would initiate arguments and altercations pertaining to visitation and other matters involving C.R. Jason also expressed concern because from the time Stacy married Andy until C.R. was in kindergarten, C.R. had sometimes used the surname "Thomas" instead of "Reynolds."
Jason testified that he thought Stacy was an unfit mother, although it was "hard to summarize." On cross-examination, Jason acknowledged that Stacy is not a bad person and that he had no personal knowledge of her day-to-day parenting.
Jason testified that his motion to change custody was "by no means a reaction or response to the fact that Stacy intended to and moved to Texas." He stated, "In other words, if C.R. had remained in Arkansas, I still would have filed."
Jason's wife, Nicole, testified that she has an excellent relationship with C.R., that C.R. has an even better relationship with his father, and that C.R. is very close with their other two children. Nicole stated that she considered herself a mother figure to C.R., that she treated him the same as her other children, and that she supported Jason's desire to have custody of him. Jason's mother and father both testified, and they indicated that they have a close relationship with C.R. and that Jason is a good father.
*445 Jason also called Gina Thomas as a witness. Gina is Stacy's sister-in-law. Gina has known C.R. since he was fifteen months old and has babysat for him. In 2014, Gina had a falling out with Stacy and Gina's brother, Andy, during which time Gina was not allowed to see C.R.
Between October 2014 and December 2014, Gina initiated and maintained contact with Jason on Facebook so she could at least see pictures of C.R. At trial, Jason questioned Gina using copies of these Facebook conversations to refresh her memory about disparaging remarks she had allegedly made about Stacy. During this examination, Gina testified:
I don't recall stating that "Stacy's a pathological liar and has serious issues." I don't recall stating that "you never know what the truth is when it comes to Stacy to be honest. Period. Stacy is the reason why we don't get to see [C.R.] or my brother." I probably said that "We had a family argument last summer but nothing to cause her to be this way. After Stacy married my brother, everything changed. To be honest, I've never liked Stacy." I don't recall stating "She is milking that hurt kneecap. I've never met anyone in my life that always has something wrong with her." I don't recall stating that "Everything she does is a disaster." I don't recall stating that "Like her phone always has a problem or she wasn't around her phone. My daughter would cry when she went to stay with her or when she would pick her up. Stacy's the only person Madison's ever been that way with." I probably asked "Please don't tell them I'm talking to you. I'm afraid she will do something crazy." I didn't want Stacy and my brother to know that I was talking to Jason.
At this point, the trial court restricted the line of questioning based on relevancy and the fact that Jason was just reading hearsay statements into the record. The trial court admonished Jason to ask the witness about her personal knowledge. The examination continued, and Gina testified that she does not believe Stacy is a pathological liar or has serious issues, nor did she think that in 2014. Gina testified that she did not believe Stacy was keeping C.R. from his father, that she did not recall Stacy making derogatory remarks about Jason, and that she did not think Stacy had any mental-health problems. Gina indicated that since the falling out in 2014, she has resumed contact with Stacy, Andy, and C.R. Gina described Stacy as an excellent mom and a good aunt to Gina's daughter. Jason moved to introduce the document containing his Facebook conversations with Gina into evidence, but the trial court denied the request and accepted it as only a proffered exhibit.
In this appeal, Jason's first argument is that the trial court erred in denying his petition for custody.[3] Jason contends that he proved a material change in circumstances and that it is in C.R.'s best interest that Jason be awarded primary custody. The material change that Jason relies on is his allegation that Stacy engaged in a willful pattern of alienation to the detriment of Jason's relationship with his son.
Jason relies on Turner v. Benson , 59 Ark. App. 108, 953 S.W.3d 596, 953 S.W.2d 596 (1997), where we stated that whether one parent is alienating a child from the other parent is an important factor to be considered in a change-of-custody case because a caring relationship with both parents *446 is essential to a healthy upbringing. Jason also cites Sharp v. Keeler , 99 Ark. App. 42, 256 S.W.3d 528 (2007), where we affirmed a change in custody to the father based on evidence of a continuing pattern of alienation by the mother, which we held to be a material change in circumstances. In Sharp , we noted that the mother's actions appeared to be a way for her to have control over the child to the exclusion of the father, and that the record was replete with the mother's attempts to alienate the father from his son. In Carver v. May , 81 Ark. App. 292, 101 S.W.3d 256 (2003), also cited by appellant, the father asserted that the mother had become so combative, uncooperative, and hostile toward his parental rights that a material change in circumstances had occurred. In affirming a change of custody to the father in Carver , we stated that it was clear that the mother was intentionally thwarting any opportunity for the father to visit his children and attempting to alienate them from their father. In Carver , we concluded that the mother's interference with visitation was so extreme that the best interest of the children required that they be removed from the situation.
Relying on the above cases, Jason argues that the trial court clearly erred in not finding a material change in circumstances based on Stacy's persistent attempts to alienate him from C.R. Jason notes that in the order being appealed, the trial court found Stacy in contempt for denying visitation. Jason further asserts that Stacy maintained a hostile relationship with him, was not proactive in communicating with him about C.R.'s life, failed to keep him apprised of C.R.'s welfare, encouraged C.R. to use the surname "Thomas," encouraged her husband to be hostile toward Jason, and continually frustrated his relationship with C.R. Under such circumstances, Jason submits that there was a material change of circumstances affecting C.R.'s best interest and that he should have been awarded custody.
On this record, we conclude that the trial court did not clearly err in denying Jason's petition for a change of custody based on the trial court's finding that Jason failed in his burden to prove a material change of circumstances affecting C.R.'s best interest. In each of the above cases relied on by Jason, we upheld the trial court's decision to change custody based on the peculiar facts of each case and our deference to the trial court's findings in child-custody matters. In Sharp , supra , we stated that the trial court is in the best position to observe the parties and evaluate the witnesses, their testimony, and the child's best interest. The same is true in this case.
In denying Jason's petition to change custody, the trial court specifically found that this is not a parental-alienation case. The record supports this conclusion. While there has clearly been some level of acrimony between the parties since they divorced and remarried, much of this appears to be related to the agreed orders entered in 2009 and 2012 and the parties' varying interpretations of the conditions therein. At any rate, the circumstances of this case are not comparable with those in the cases on which Jason relies. Although Stacy was held in contempt for isolated incidents of denying visitation over the past few years, the trial court concluded that this did not rise to the level of a change in circumstances bearing on C.R.'s best interest. Jason gave testimony about specific instances where he thought Stacy and her husband had been uncooperative and hostile toward him. Stacy, on the other hand, testified that she thought it important for C.R. to have visitation with his father and that the parties have a workable relationship. As in most child-custody *447 cases, this case in large part depended on the credibility of the witnesses. Leaving the credibility decisions to the trial court, as we must, we find no clear error in the trial court's finding that Stacy was not alienating Jason from his son and that there was no material change in circumstances warranting a change in custody.
Jason's next argument is that the trial court erred when it refused to consider and allow him to introduce evidence of Gina Thomas's inconsistent statements. Jason called Gina as a hostile witness, and he questioned her about a Facebook conversation he had with her in 2014, at a time when Gina had a falling out with Stacy and Gina's brother, Andy. After permitting some of this examination, the trial court cut off the line of questioning, and it subsequently refused to allow Jason to admit the Facebook conversation into evidence. Jason asserts that this was reversible error.
The trial court has wide discretion in evidentiary determinations. Wakefield v. Bell , 2018 Ark. App. 120, 542 S.W.3d 908. On appeal, we will not reverse a trial court's ruling on admissibility of evidence absent an abuse of discretion. Id. Neither will we reverse an evidentiary ruling absent a showing of prejudice. Id.
We conclude that Jason failed to show that the trial court's evidentiary rulings resulted in any prejudice. After Jason called Gina as a witness, he was permitted to interrogate her with the 2014 Facebook exchange, and Gina acknowledged that she probably did make some of the statements on Facebook such as "I've never liked Stacy" and "please don't tell them I'm talking to you, I'm afraid she will do something crazy." Gina did not recall making other statements such as "Stacy's a pathological liar and has serious issues." Upon further examination, Stacy made it clear that her Facebook comments were made more than two years earlier when she was mad at Stacy for not letting her see C.R. Gina testified that she did not believe Stacy is a pathological liar or had serious issues, and that Stacy is an excellent mother to C.R. and aunt to Gina's daughter. The trial court limited the line of questioning regarding the Facebook conversation, and indicated that it did not believe anything that Gina had testified to would impact its decision in the case. We hold that Jason has not demonstrated that any possible error resulted in prejudice. Jason was allowed to question Gina about unflattering Facebook comments Gina made about Stacy more than two years before the hearing, the trial court indicated that Gina's testimony in this regard was not instrumental to its decision in the case, and any further reference to the Facebook conversation would have been largely cumulative to what was already before the court. Because Jason cannot show prejudice, no reversible error occurred in this regard.
Jason's remaining argument is that the trial court erred in granting Stacy's motion to amend the final order. However, while Jason did file a timely notice of appeal from the final order entered on March 20, 2017, he did not file a notice of appeal from the amended order entered on August 17, 2017. The filing of a timely notice of appeal is essential for this court to obtain jurisdiction. Rossi v. Rossi , 319 Ark. 373, 892 S.W.2d 246 (1995). Because Jason did not appeal from the August 17, 2017 amended order he now attempts to challenge, we do not consider this argument.
Affirmed.
Gladwin and Vaught, JJ., agree.

Jason's visitation during the school year was every other weekend and on Thursday nights when Jason did not have weekend visitation. The visitation schedule included accommodations for holiday visits. The parties agreed to divide time with C.R. equally during the summer.

Jason introduced into evidence a voluminous number of emails exchanged between the parties.

Jason does not challenge the trial court's granting of Stacy's petition to relocate. Nor did he argue below or on appeal that Stacy's relocation was a material change in circumstances warranting a change in custody.